# **EXHIBIT 3**



Unified Program Integrity Contractor
South Western Jurisdiction (UPICSW)

September 13, 2024

Kevin Hannah, CEO
Advanced Pathology Solutions
5328 Northshore CV
North Little Rock, AR 72118

**Re:    Advanced Pathology Solutions**
**Provider Medicare ID Number(s): 462536**
**Provider NPI: 1053686964**
**Reference Number: PSP-240620-00002**

Dear Mr. Hannah:

This letter serves to inform you that on August 19, 2024, the Southwestern Unified Program Integrity Contractor (hereinafter "Qlarant"), received your letter, dated August 16, 2024 ("rebuttal"), responding to the Notice of Suspension of Medicare Payments to Advanced Pathology Solutions, LLC ("APS"), dated August 8, 2024 ("Notice of Payment Suspension"). After careful review of the information provided, the Centers for Medicare & Medicaid Services (hereinafter "CMS") has determined that the suspension of Medicare payments to APS will continue.

## I. APS's Rebuttal

In the rebuttal, you raised the following issues:

### Beneficiary Access to Services

You asserted that the payment suspension "will jeopardize the health and welfare of Medicare beneficiaries who rely on APS's pathology services to detect life threatening gastrointestinal ('GI') conditions, including cancer"; and that such services are "particularly critical to beneficiaries living in rural areas where the type of services APS provides are located hours away and difficult to access or even inaccessible...." Further, you asserted that a complete payment suspension will lead APS to "cease operations," which will limit or terminate "not only beneficiary access, but other vulnerable patient access, as well."

Finally, you stated that limiting access to beneficiaries will cause beneficiaries to forego "diagnoses of otherwise curable or early-stage treatable conditions," which you asserted will ultimately cost the Medicare program more than would be incurred if APS is "able to timely provide pathological diagnoses."



**Basis for the Payment Suspension**

You also asserted that the "substantive foundation" of the payment suspension is incorrect for several reasons:

### Medical Necessity

First, you asserted that "APS's pathologists determined that, in their professional medical judgment" the claims listed as examples in the Notice of Payment Suspension were medically necessary, which you argue is documented within the medical records. You provided summaries for each of the example claims, along with signed, but undated, physician statements to support that the services provided (Giemsa, Helicobacter immunostain, and Alcian Blue PAS stains) were medically necessary. You also stated that APS is willing to provide additional documentation of medical necessity should it be requested to do so.

You further asserted that APS's pathologists' medical necessity determinations are "sound and are entirely consistent with professional pathologist standards," and provided a letter, dated December 24, 2014, to Palmetto GBA, LLC ("Palmetto"), wherein Gene N. Herbek, MD, FCAOP, then-President of the College of American Pathologists ("CAP"), shared CAP's concerns about Palmetto's Draft Local Coverage Determination DL36593 concerning special histochemical stains and immunohistochemical stains.

In addition, you asserted that the medical judgment of the treating pathologist "is dispositive of the medical necessity analysis," and that "CMS's interpretations of its governing statutes, including CMS's medical necessity determinations, are no longer entitled to deference," per *Loper Bright Enterprises v. Raimondo*, 604 U.S. \_\_\_\_ (2024) and other federal court cases. You further asserted that CMS regulations governing medical necessity determinations (citing 42 C.F.R. §§ 424.10, 424.24, and 410.32(a), as examples) "require deference to the treating physician's or pathologist's medical opinion" and that, pursuant to 42 U.S.C. § 1395's prohibition against federal interference in the practice of medicine or the manner in which medical services are provided, and considered with the other authorities cited, "the treating pathologist's medical judgment takes precedence."

### APS Lab Arrangements with Health Care Providers

Second, you asserted that "there is no basis for CMS's determination that there are credible allegations of fraud related to APS's Lab Arrangements." You argue that the arrangements, "under which the Lean Lab performs and bills for the technical component of the pathology services, and APS performs and bills for the professional component," are lawful and that this arrangement is "common in pathology" and "is expressly authorized by CMS regulations where, as here, different providers perform the components."[1] In addition, you asserted that the arrangements are "pursuant to comprehensive written agreements and the compensation

---

[1] You cite 42 C.F.R. § 414.40(b)(2), which addresses professional and technical components of services provided.



exchanged between the parties is fair market value for the services provided and do not take into account the volume or value of referrals between the parties."

With regard to the example claims, you argued that "APS has performed the professional component of pathological services referred to APS, and has provided consulting services and a Medical Director for the histology lab at a fair market value cost pursuant to a written agreement."

## II. CMS's Rebuttal Response

CMS has reviewed your rebuttal and the accompanying information.

### Beneficiary Access to Services

In your rebuttal, you expressed concern that the payment suspension may jeopardize the health and welfare of Medicare beneficiaries served by APS. CMS has the authority to make "good cause" exceptions[2] when deciding to suspend Medicare payments to a provider or supplier. Each time a payment suspension is implemented, CMS makes an individualized assessment to determine the availability of alternative care to beneficiaries in the relevant geographic area. In your situation, CMS determined that there are enough pathologists and laboratories offering pathology services to Medicare beneficiaries in the area served by APS.

Regarding the potential financial impact of the payment suspension on the ability of APS to continue operations, we understand your concern surrounding the financial hardship a payment suspension creates. CMS has the authority to implement payment suspensions when there is reliable information that an overpayment exists and/or a credible allegation of fraud. A payment suspension is implemented so that CMS can protect Medicare program funds while an investigation into a provider's or supplier's activities is conducted. Given the potential financial impact on providers, suppliers, and their employees, CMS takes great care in deciding when to implement a payment suspension.

### Basis for the Payment Suspension

To the extent that you believe further detail of the credible allegations of fraud is required to have been provided with the Notice of Payment Suspension, CMS adhered to the requirements of the payment suspension regulations and its payment suspension process. The Notice of Payment Suspension informed APS that Medicare payments to the provider have been suspended, the basis for the payment suspension, and that APS had certain rights to respond. In addition, a non-exhaustive list of example claims to which the credible allegations of fraud apply was included.

---

[2] 42 C.F.R. § 405.371(b).



Unified Program Integrity Contractor
South Western Jurisdiction (UPICSW)

The payment suspension regulations do not require CMS to provide additional details about the credible allegations of fraud discussed in the Notice of Payment Suspension.

### Medical Necessity and APS Lab Arrangements with Health Care Providers

The summaries within the rebuttal and the undated physician statements you provided with the rebuttal are insufficient to support the medical necessity of the services provided. *See* Social Security Act § 1833(e) [42 U.S.C. § 1395l(e)], which requires that a provider of services under Medicare Part B must furnish "such information as may be necessary in order to determine the amounts due such provider...." You did not provide any supporting medical record documentation. It is incumbent upon APS to fully cooperate in the investigation into its Medicare billing, which includes submission of medical record evidence substantiating narrative comments. Additional evidence (such as a physician statement) may be provided; however, medical record documentation is necessary to support claims billed to Medicare.

Further, the fact that a treating physician ordered a particular service does not alone establish that the service was medically necessary. Program integrity contractors must determine that "the information submitted by the supplier or provider [ ] corroborate[s] the documentation in the beneficiary's medical documentation and confirm that Medicare coverage criteria have been met." Chapter 3, Section 3.3.2.1, of the Medicare Program Integrity Manual (CMS Publication 100-08 or "MPIM"). Regarding laboratory testing, program integrity contractors must "verify that the supporting authenticated medical record documentation contains sufficient information supporting the ordered/provided tests are reasonable and necessary per 42 CFR § 410.32." MPIM, Chapter 6, Section 6.9.1.

Similarly, APS's statements about the arrangements it has with healthcare providers' offices, and assertions that services it provides to these providers' offices are "pursuant to written agreement," "at fair market value cost," and "do not take into account the volume or value of referrals between the parties" are insufficient, without documentation to substantiate these claims.

### III. Conclusion

After careful review of the information and arguments set forth in your correspondence, the suspension of Medicare payments to APS will continue.

Should you have any questions regarding the status of the suspension, please direct your inquiry to ProviderSuspensionSW@Qlarant.com.

Sincerely,

UPIC South Western Administration
Qlarant Integrity Solutions, LLC