# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF ARKANSAS

| | | |
|---|---|---|
| ADVANCED PATHOLOGY SOLUTIONS, PLLC, | : | Case No. 4:25-cv-229-JM |
| | : | |
| *Plaintiff*, | : | |
| | : | |
| v. | : | |
| | : | |
| ROBERT F. KENNEDY, in his official capacity as Secretary for the United States Department of Health & Human Services, | : | |
| | : | |
| and | : | |
| | : | |
| STEPHANIE CARLTON, in her official capacity as Acting Administrator of the Centers for Medicare and Medicaid Services, | : | |
| | : | |
| *Defendants*. | : | |

## PLAINTIFF'S BRIEF IN SUPPORT OF ITS MOTION FOR A PRELIMINARY AND PERMANENT INJUNCTION

## <u>INTRODUCTION</u>

Advanced Pathology Solutions, PLLC ("APS" or "Plaintiff") is a pathology laboratory located in Little Rock, Arkansas. APS's pathologists analyze and interpret medical tests, including biopsies to diagnose cancer, for thousands of patients nationwide.

Over <u>seven</u> months ago, the U.S. Centers for Medicare and Medicaid Services ("CMS") suspended payments to Plaintiff without explanation. And there is no end in sight: CMS has refused to tell Plaintiff why its payments are suspended, what evidence supports the suspension, or when the suspension will end (if ever). CMS sent Plaintiff a notice of payment suspension, which listed five claims that it characterized as "Billing for Medically Unnecessary Services." The notice also asserted that Plaintiff has improper referral arrangements. In response, Plaintiff submitted a rebuttal statement with detailed documentary evidence, explaining that the services associated with the five claims were medically necessary and that its referral relationships comply with all applicable laws.

Even though CMS was obligated to consider Plaintiff's evidence, determine whether the facts justify a suspension, and send a notice "contain[ing] specific findings on the conditions upon which the suspension is initiated, continued, or removed and an explanatory statement of the determination," 42 C.F.R. § 405.375(b)(2), CMS failed to do so. Instead, it summarily denied Plaintiff's request to lift the suspension and stated that it did not have to "provide additional details." Based on five claims *collectively* worth less than $1,400, CMS has now withheld $9.8 million (and counting) in Medicare payments from Plaintiff.

This unwarranted suspension is forcing Plaintiff out of business. Medicare payments comprise about forty percent (40%) of APS's revenue, and the suspension has already dramatically curtailed the company's operations. It has been forced to liquidate lines of business, freeze hiring,

and incur the costs (without compensation) of performing services for Medicare beneficiaries to keep its relationships with its customers. APS will soon have to shut down, leaving Medicare patients—particularly those in rural areas—at risk of being unable to access its specialized services. Left with no other option, APS has sued the Secretary of the U.S. Department of Health and Human Services ("HHS") and the Acting Administrator of CMS (collectively, "Defendants"), seeking injunctive and mandamus relief.

Plaintiff is entitled to a preliminary and a permanent injunction. First, APS has already experienced irreparable harm because the Defendants have deprived it of its property without due process of law. Without an injunction, APS will soon cease to exist. Second, on the merits, APS easily satisfies the fair-chance-of-success standard for a preliminary injunction and also satisfies the actual-success standard for a permanent injunction. Finally, the public interest and equities weigh heavily in APS's favor. It is contrary to the most fundamental principles of our constitutional system to allow the government "to act secretly behind closed doors," outside of the sunlight of procedural safeguards, and simply seize someone's earnings without explanation. *See Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 584 (1972) (Douglas, J., dissenting).

That is precisely what the government has done here. If the government has viable claims against APS, it should assert them so that APS can address them. Instead, the government has left APS languishing under a suspension that will force it out of business. Whatever interest the government and public have in combatting fraud does not justify forcing a local business to close based on a *miniscule fraction* of the claims it has submitted to Medicare (which are demonstrably appropriate). Again, the Defendants have withheld $9.8 million (and counting) based on about $1,400 of allegedly unnecessary procedures; Plaintiff's explanation of the necessity of those

services has been met with silence. The public interest would be best served by upholding APS's constitutional rights and forcing the Defendants to follow their own laws.

For these reasons, and those discussed below, Plaintiff respectfully requests that this Court issue an injunction, ordering the Defendants to lift the suspension of (and release) its Medicare payments and issue an overpayment determination so that it can exercise its appeal rights.

## FACTUAL BACKGROUND

### 1.      Regulatory Framework

In 1965, Congress enacted Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395 *et seq.*, commonly known as the Medicare Act, to pay "for healthcare for elderly and disabled individuals." *Yale New Haven Hosp. v. Becerra*, 56 F.4th 9, 14 (2d Cir. 2022). HHS administers the Medicare program through CMS, "an agency housed within HHS." *Medicaid & Medicare Advantage Prods. Ass'n of P.R., Inc. v. Hernandez*, 58 F.4th 5, 8 (1st Cir. 2023). To participate in Medicare, a healthcare services provider must meet certain requirements. *See* 42 U.S.C. § 1395cc(a); 42 C.F.R. § 489.10(b). "If CMS determines that the provider meets the requirements," it sends the provider a "provider agreement," which the provider then signs if it "wishes to participate." 42 C.F.R. § 489.11(a)–(b).

CMS may temporarily suspend Medicare payments to investigate allegations of fraud and issue an overpayment determination. *See* 42 C.F.R. §§ 405.371–72. This short pause strikes a careful balance between a provider's interest in being paid for the services it renders to Medicare beneficiaries and the government's interest in combatting Medicare fraud. *See Clarinda Home Health v. Shalala*, 100 F.3d 526, 530 (8th Cir. 1996). CMS may suspend Medicare payments when "a credible allegation of fraud exists against a provider . . . , unless there is good cause not to suspend payments." 42 C.F.R. § 405.371(a)(2). There is "good cause" not to suspend payments

when, for example, "other available remedies" would "more effectively" protect Medicare funds or when continued suspension is "not in the best interests of the Medicare program." 42 C.F.R. § 405.371(b)(1).

If CMS suspends a provider's Medicare payments, CMS "must" give the provider "an opportunity to submit a rebuttal statement as to why the suspension should be removed." 42 C.F.R. § 405.372(b)(2). Once a provider submits a rebuttal statement, CMS "must within 15 days, from the date the statement is received, consider the statement (including any pertinent evidence submitted), together with any other material bearing upon the case, and determine whether the facts justify the suspension." 42 C.F.R. § 405.375(a). After CMS makes its determination, it "must send written notice" to the provider, and the notice "must . . . contain specific findings on the conditions upon which the suspension is initiated, continued, or removed and an explanatory statement of the determination." 42 C.F.R. § 405.375(b)(2). The determination "is not appealable" within the agency. 42 C.F.R. § 405.375(c).

If CMS suspends Medicare payments "based upon credible allegations of fraud," it "must" determine "whether an overpayment exists." 42 C.F.R. § 405.372(c)(2). After all, the very purpose of the suspension is to gather and evaluate the necessary facts to make an overpayment determination, and federal regulations guarantee that the suspension "will be temporary." 42 C.F.R. § 405.372(d)(3)(ii). The overpayment determination is critical, as it triggers a provider's appeal rights. *See* 42 U.S.C. § 1395ff(b); 42 C.F.R. § 405.904. Unless and until the provider has an overpayment determination in hand, it has nothing to appeal.

### 2.    Facts Giving Rise to this Action

APS is a pathology laboratory in Little Rock, Arkansas. Hannah Decl. ¶ 3. It performs diagnostic medical testing for hospitals and physicians, including gastroenterologists, podiatrists,

wound-care specialists, pain specialists, orthopedists, and plastic surgeons. Hannah Decl. ¶ 5. Thousands of patients rely on APS every day to diagnose cancer, gastrointestinal diseases, and other ailments. *Id.*

On August 8, 2024, CMS sent Plaintiff a notice of payment suspension ("Suspension Notice") through its Unified Program Integrity Contractor ("UPIC"). Hannah Decl. ¶ 9 & Ex. 1. The Suspension Notice stated that CMS had suspended Plaintiff's Medicare payments on July 26, 2024, based on purported "credible allegations of fraud." Hannah Decl., Ex. 1. As part of the suspension, CMS imposed a hold on *all* payments for services rendered to Medicare beneficiaries. *Id.* This amounts to approximately $1.3 million per month, which is roughly 40% of APS's revenue. Crain Decl. ¶ 10.

The Suspension Notice stated that CMS had received information that Plaintiff billed for medically unnecessary services and that Plaintiff "entered into arrangements to set up mini labs or 'Lean Labs' at a reduced cost" to induce referrals. Hannah Decl., Ex. 1. In support, the Suspension Notice listed without explanation five claims that allegedly constituted "Billing for Medically Unnecessary Services" and asserted that Plaintiff provided certain (unspecified) services to induce referrals.[1] *Id.* These five claims represented less than 1% of all claims APS submitted to Medicare during that period (June 2, 2022, through July 19, 2022), and less than 0.02% of all claims APS submitted to Medicare in 2022. Crain Decl. ¶ 11. What is more, these claims are *collectively* worth less than $1,400. Crain Decl. ¶ 12. So based on about $1,400 in allegedly unnecessary services, CMS froze almost $10 million (and counting) of Plaintiff's funds. Crain Decl. ¶ 9.

---

[1] Prior to receiving the Suspension Notice, APS had never been subject to any investigation by CMS or HHS. It had previously received a Civil Investigative Demand from the Department of Justice ("DOJ"), and APS cooperated fully with that investigation. DOJ filed no claims against APS. APS has requested information from DOJ about the suspension, but DOJ has denied those requests and has denied any involvement whatsoever in the suspension. Hannah Decl. ¶ 19.

On August 16, 2024, Plaintiff submitted a rebuttal statement ("Rebuttal") and provided detailed documentary evidence about all five claims, explaining why the services provided were medically necessary for the pathologists to make medical diagnoses. Hannah Decl. ¶ 11 & Ex. 2. Specifically, APS showed that each claim involved specialized stains that are needed to diagnose certain life-threatening gastrointestinal conditions. Hannah Decl., Ex. 2 at 2–3 & Attachments 1–5. Pathologists generally follow a two-step process in examining biopsy samples mounted on glass slides: They first stain the sample to highlight the presence of particular structures or compounds, and then they examine the samples under a microscope to determine whether the structures or compounds are present. In each of the five claims listed in the Suspension Notice, APS's pathologists selected stains based on the patient's characteristics and the referring physician's notes. *Id.* Each of the stains was appropriate under current best practices in pathology. Indeed, without the specialized stains, the pathologists would not have been able to diagnose the patients' conditions. *See id.* Finally, Plaintiff disputed the allegation that it had entered into mini-lab arrangements to induce referrals, pointing out that all such arrangements are governed by comprehensive contracts and none of the compensation is related to referrals. *Id.* at 4–5.

The Rebuttal requested that HHS rescind the suspension because (a) the allegations are unfounded; (b) APS will be forced to shut down if the suspension continues; and (c) Medicare patients—particularly those in rural areas—will be put at risk if they are unable to access the specialized services Plaintiff provides. *Id.* at 1–2. Federal regulations required CMS to respond to Plaintiff's rebuttal statement within 15 days of receipt and required its response to "contain *specific findings* on the conditions upon which the suspension is initiated, continued, or removed and an explanatory statement of the determination." 42 C.F.R. § 405.375(b)(2) (emphasis added).

The UPIC did not respond within 15 days, and its late response contained no specific findings. Rather, the UPIC sent a vague response on September 13, 2024 ("Response"), 25 days after receipt of Plaintiff's Rebuttal. Hannah Decl. ¶ 13 & Ex. 3. The Response summarily denied Plaintiff's request to lift the suspension, without providing any specific findings. *See* Hannah Decl., Ex. 3. And the Response stated—contrary to governing law—that CMS was not required "to provide additional details" about the allegations supporting the suspension. *Id.* at 4. The letter also faulted Plaintiff for failing to provide documents that CMS had not requested and would not have provided any materially different information. *See id.*

On January 24, 2025, the UPIC notified Plaintiff that the payment suspension would continue indefinitely while its investigation continues. Hannah Decl. ¶ 15 & Ex. 4. But there is no evidence that CMS or the UPIC is conducting an investigation. The first step of any investigation into billing for allegedly unnecessary medical services is to request the underlying medical records. To date, APS has received no such request. Hannah Decl. ¶ 18; Crain Decl. ¶ 6. Nor has CMS or the UPIC asked to speak with Plaintiff's attorneys or to interview any of its employees or representatives. Hannah Decl. ¶ 18; Crain Decl. ¶ 6. It has been 238 days since the suspension of Plaintiff's Medicare payments, and the Defendants have taken no steps to conduct any investigation, support the suspension, or explain the suspension to APS. Hannah Decl. ¶ 17; Crain Decl. ¶ 5.

The Defendants are currently preventing APS from receiving approximately $9.8 million in Medicare payments. Crain Decl. ¶ 9. Those claims have been accepted and approved without denial or down-coding, but the money has not been paid to APS because of the suspension. Crain Decl. ¶ 8. With no end in sight, APS is now on the brink of financial ruin. APS has been forced to abandon its expansion plans and instead cut costs by liquidating its podiatry division, which was

previously profitable but heavily dependent on Medicare payments. Hannah Decl. ¶ 23; Crain Decl. ¶¶ 13, 15. APS has also reduced salaries significantly and has been unable to fill open positions. Crain Decl. ¶ 16. Although APS has avoided mass layoffs so far, in six to eight weeks, APS will not have enough money to pay its employees. Hannah Decl. ¶ 24; Crain Decl. ¶ 17. Soon enough, in two to three months' time, the suspension will force APS to close—without having any meaningful opportunity to challenge, or even understand, the purported basis for CMS's actions. Hannah Decl. ¶ 25; Crain Decl. ¶ 13.

APS filed suit against CMS and HHS, asserting claims for the deprivation of its property without due process of law, mandamus relief, *ultra vires* agency action, and unlawful agency action under the Administrative Procedure Act. It now moves for a preliminary and a permanent injunction that orders the Defendants to lift the suspension of (and release) its Medicare payments and issue an overpayment determination so that it can exercise its appeal rights.

## ARGUMENT

The Court considers four factors in deciding whether to issue a preliminary injunction: "(1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that [the] movant will succeed on the merits; and (4) the public interest." *Sleep No. Corp. v. Young*, 33 F.4th 1012, 1016 (8th Cir. 2022) (quoting *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981) (en banc)). The balance-of-the-equities and public-interest factors "merge" when the "federal government is the party opposing the injunction." *Missouri v. Trump*, 128 F.4th 979, 996–97 (8th Cir. 2025). Although no factor is dispositive, "the third factor—probability of success—is the most significant." *Sleep No. Corp.*, 33 F.4th at 1016.

The Eighth Circuit has "two standards a district court may apply when assessing a movant's probability of success on the merits." *D.M. ex rel. Bao Xiong v. Minn. State High Sch. League*, 917 F.3d 994, 999–1000 (8th Cir. 2019). The first standard, "which applies in most instances," asks "whether the party requesting a preliminary injunction has a 'fair chance of prevailing.'" *Id.* (quoting *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 732 (8th Cir. 2008) (en banc)). The second standard is "more rigorous" and asks "whether the movant is 'likely to prevail' on his or her claims." *Id.* (quoting *Rounds*, 530 F.3d at 733). The higher standard applies when a movant seeks to enjoin a statute and "reflects the idea that governmental policies implemented through legislation . . . [and] developed through presumptively reasoned democratic processes are entitled to a higher degree of deference." *Rodgers v. Bryant*, 942 F.3d 451, 455–56 (8th Cir. 2019) (quoting *Rounds*, 530 F.3d at 732).

Here, APS is not seeking to enjoin a law and instead is seeking an injunction ordering the Defendants *to follow* the law. As such, the usual "fair chance of prevailing" standard applies. "To show a fair chance of prevailing, a party must show that its claims provide fair ground for litigation, but it need not show that it has a greater than fifty percent likelihood of success." *Sleep No. Corp.*, 33 F.4th at 1016–17 (cleaned up) (citations omitted). Where the "movant has raised a substantial question and the equities are otherwise strongly in his favor, the showing of success on the merits can be less." *Missouri v. Biden*, 112 F.4th 531, 536 (8th Cir. 2024) (quoting *Nebraska v. Biden*, 52 F.4th 1044, 1046 (8th Cir. 2022)); *see also id.* ("If the balance tips decidedly towards the plaintiffs and the plaintiffs have raised questions serious enough to require litigation, ordinarily the injunction should issue." (quoting *Fennell v. Butler*, 570 F.2d 263, 264 (8th Cir. 1978))).

All four factors support injunctive relief in this case. Without an injunction, APS will be forced to shut down, and Medicare patients—particularly those in rural areas—may be unable to

obtain the specialized services APS provides. APS also easily shows that its claims provide fair ground for litigation. Finally, even if the suspension is enjoined, the government will get paid its due. If the investigation concludes that APS has billed for unnecessary services, APS must pay back those funds. Because the government will experience no harm by releasing APS's funds and APS will experience the gravest of harms if it does not, the equities weigh heavily in favor of injunctive relief. "The public's true interest lies in the correct application of the law," *Kentucky v. Biden*, 23 F.4th 585, 598 (6th Cir. 2022), which requires the government to act in the sunlight of procedural safeguards, not secretly behind closed doors.

### 1.    Plaintiff Will Be Irreparably Harmed Without an Injunction.

Without an injunction, APS will suffer three separate and independent irreparable harms: (1) deprivation of its constitutional rights; (2) extinction; and (3) the loss of services to Medicare beneficiaries, particularly in rural areas.

"Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009). APS "is not required to prove with certainty the threat of irreparable harm." *Sleep No. Corp.*, 33 F.4th at 1018. Instead, it need only "prove that irreparable injury is *likely* in the absence of an injunction." *Id.* (emphasis added) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)).

To start, the "denial of a constitutional right" is an "irreparable harm." *Ng v. Bd. of Regents*, 64 F.4th 992, 998 (8th Cir. 2023) (citation omitted); *see also Book People, Inc. v. Wong*, 91 F.4th 318, 340–41 (5th Cir. 2024) ("When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." (citation omitted)); *Elrod v. Burns*, 427 U.S. 347, 373–74 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."). Because the Defendants

have deprived APS of its property without due process of law, APS has suffered irreparable harm. But that is just the beginning.

Without an injunction, APS will almost certainly be forced out of business. Although "economic loss does not, in and of itself, constitute irreparable harm," it does when the "loss threatens the very existence of the [party]'s business." *Packard Elevator v. Interstate Commerce Comm'n*, 782 F.2d 112, 115 (8th Cir. 1986). The Defendants have withheld $9.8 million (and counting) in Medicare payments. That number increases by about $1.3 million each month. To stay afloat, APS has already been forced to liquidate lines of business, abandon strategic growth plans, leave positions unfilled, and incur the costs (without compensation) of performing services for Medicare beneficiaries to keep its relationships with its customers. It is now on the brink of financial ruin and will almost certainly have to shut down unless the Court issues an injunction. "The loss of . . . an ongoing business representing many years of effort and the livelihood of its . . . owners, constitutes irreparable harm. What [APS] stands to lose cannot be fully compensated by subsequent monetary damages." *Roso Lino Beverage Distribs., Inc. v. Coca Cola Bottling Co. of N.Y., Inc.*, 749 F.2d 124, 125–26 (2d Cir. 1984) (per curiam); *see also Doran v. Salem Inn, Inc.*, 422 U.S. 922, 932 (1975) ("[R]espondents alleged . . . that absent preliminary relief they would suffer a substantial loss of business and perhaps even bankruptcy. Certainly the latter type of injury sufficiently meets the standards for granting interim relief, for otherwise a favorable final judgment might well be useless."); *Ryko Mfg. Co. v. Eden Servs.*, 759 F.2d 671, 673 (8th Cir. 1985) (affirming preliminary injunction and district court's finding that "money damages could not fully compensate [the distributor] for the loss of its business"); *Minard Run Oil Co. v. U.S. Forest Serv.*, 670 F.3d 236, 255 (3d Cir. 2011) (affirming district court's preliminary injunction and finding of irreparable harm where the court "credited the testimony of several business owners that the new

drilling moratorium had dramatically affected their business and would probably cause them to shut down or go bankrupt if it continued"); *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1188 (9th Cir. 2022) (noting that the "threat of 'extinction' is enough to establish irreparable harm, even when damages may be available and the amount of direct financial harm is ascertainable" and affirming preliminary injunction where the district court credited plaintiff's "assertion that the survival of its business is threatened").

There is more. The end of APS is likely the end of many Medicare beneficiaries' access to the specialized services it provides. APS's pathologists are fellowship-trained and highly experienced, and their skillset simply does not exist in many local markets. Hannah Decl. ¶ 27. This, too, is "sufficient for irreparable injury." *Cf. Family Rehab., Inc. v. Azar*, 886 F.3d 496, 504 (5th Cir. 2018) ("The combined threats of going out of business and disruption to Medicare patients are sufficient for irreparable injury.").

### 2.    Plaintiff Easily Shows a Fair Chance of Prevailing.

The "most significant" factor in deciding whether to issue a preliminary injunction is the "probability of success." *Sleep No. Corp.*, 33 F.4th at 1016. Because Plaintiff is not seeking to enjoin a statute, the usual fair-chance standard applies here. Under this standard, Plaintiff "must show that its claims provide fair ground for litigation, but it need not show that it has a greater than fifty percent likelihood of success." *Id.* at 1016–17 (cleaned up) (citations omitted).

### a.    The Defendants Have Deprived Plaintiff of its Property Without Due Process of Law.

"[T]he Due Process Clause provides that certain substantive rights—life, liberty, and property—cannot be deprived except pursuant to constitutionally adequate procedures." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541 (1985). "Required procedures may vary according to the interests at stake, but the fundamental requirement of due process is the opportunity to be

heard at a meaningful time and in a meaningful manner." *Bus. Commc'ns, Inc. v. U.S. Dep't of Educ.*, 739 F.3d 374, 380 (8th Cir. 2013) (cleaned up) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976)). To determine if the process provided is sufficient, courts balance (1) the "private interest that will be affected by the official action"; (2) the "Government's interest"; and (3) the "risk of an erroneous deprivation of [the private] interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards." *Mickelson v. Cnty. of Ramsey*, 823 F.3d 918, 924 (8th Cir. 2016) (quoting *Wallin v. Minnesota Dep't of Corr.*, 153 F.3d 681, 690 (8th Cir. 1998)); *see also Mathews*, 424 U.S. at 335. "The ultimate balance involves a determination as to when, under our constitutional system, judicial-type procedures must be imposed upon administrative action to assure fairness." *Mathews*, 424 U.S. at 348.

The first question is whether APS has a constitutionally protected interest in the funds it has earned by providing services to Medicare beneficiaries. It does. A plaintiff has a protected property interest in something when he or she has a "legitimate claim of entitlement" to it. *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972). Property interests are not created by the U.S. Constitution but are derived instead from an independent source, such as "federal law." *Educ. Assistance Corp. v. Cavazos*, 902 F.2d 617, 627 (8th Cir. 1990). Federal law gives providers a right to be paid for the services they provide, subject to a few statutory qualifications. *See* 42 U.S.C. § 1395g(a) (stating, as relevant, that "the provider of services shall be paid"). Because federal law entitles APS to payment for the services it provides, APS has a constitutionally protected interest in those funds. *See, e.g.*, *Arthritis & Osteoporosis Clinic of E. Tex., P.A. v. Azar*, 450 F. Supp. 3d 740, 749 (E.D. Tex. 2020) ("[A provider] has a valid property interest in receiving Medicare payments for services rendered." (quoting *Angels of Care Home Health, Inc. v. Azar*, No. 18-cv-3268, 2019 WL 1101286, at *2 (N.D. Tex. Feb. 13, 2019))); *Med-Cert Home Care,*

*LLC v. Azar*, 365 F. Supp. 3d 742, 751 (N.D. Tex. 2019) ("Precedent makes clear that Med-Cert has a valid property interest in receiving Medicare payments for services rendered."); *Adams EMS, Inc. v. Azar*, No. H-18-1443, 2018 WL 5264244, at *10 (S.D. Tex. Oct. 23, 2018) (same); *Morrison v. Sebelius*, No. 2:11-cv-1002, 2013 WL 3288167, at * 4 (S.D. Ohio June 28, 2013) (same); *Family Rehab., Inc. v. Azar*, No. 17-cv-2018, 2018 WL 3155911, at *4 (N.D. Tex. June 28, 2018) (same).

To be sure, it may be true that there is no constitutionally protected interest in funds that are *temporarily* withheld during an *active* fraud investigation. *See, e.g.*, *Clarinda Home Health v. Shalala*, 100 F.3d 526, 531 (8th Cir. 1996) ("[I]t is not a violation of due process to *temporarily* withhold Medicare payments during an ongoing investigation for acts of fraud." (emphasis added)). But those are not the facts here. For starters, the Defendants have withheld *all* of APS's Medicare payments (to the tune of millions)—not merely payments for the five claims (worth less than $1,400) they allege are fraudulent. What is more, the Defendants have *indefinitely* suspended payment of APS's funds (for almost eight months and counting) and have *taken no steps* to conduct an investigation. Numerous federal courts have held that while there may be no property interest in funds that are *temporarily* withheld, there is a property interest in funds that are *indefinitely* withheld. *See Alexandre v. Ill. Dep't of Healthcare & Fam. Servs.*, No. 20-6745, 2021 WL 4206792, at *7–8 (N.D. Ill. Sept. 15, 2021); *Maynard v. Bonta*, No. 02-06539, 2003 U.S. Dist. LEXIS 16201, at *57–60 (C.D. Cal. Aug. 29, 2003) (collecting cases); *Krebsbach v. Heckler*, 617 F. Supp. 548, 551 (D. Neb. 1985) ("[T]he Secretary may temporarily suspend payments in order to conduct an investigation when confronted with reliable evidence of fraud. Such a suspension cannot continue indefinitely, but may be of a reasonable duration."). Similarly, although federal regulations allow CMS to suspend payment based on credible allegations of fraud, the same regulations guarantee that any suspension "will be temporary." 42 C.F.R. § 405.372(d)(3)(ii).

Indeed, the right is so well-established that, in a recent case before the Eighth Circuit, the government did not even challenge the provider's assertion that he has a property interest in the Medicare payments he earned. *See Padda v. Becerra*, 37 F.4th 1376, 1382 (8th Cir. 2022) ("Medicare does not challenge the assertion that Dr. Padda has a property interest in Medicare payments he has earned, so we will proceed to the issue of whether Dr. Padda received sufficient process.").

Whatever the precise contours of APS's property interest, it includes—at a bare minimum—the right not to be deprived *indefinitely* of the Medicare payments it has earned by providing services. Not only has the suspension here lasted almost eight months, but more importantly, the Defendants have taken no steps *at all* in the investigation and violated federal law along the way. *See Alexandre*, 2021 WL 4206792, at *9 (ruling that a "trier of fact could find that, in the year and a half that [plaintiff]'s Medicaid payments have been suspended, that suspension crossed the line from 'temporary' to 'indefinite.' Hence, [plaintiff] has adequately alleged that she has a property interest in withheld payments for which she is owed due process of law."); *Maynard*, 2003 U.S. Dist. LEXIS 16201, at *60 ("The court cannot find as a matter of law that a two-year investigation is 'temporary' in duration. Rather, there is a question of fact as to whether such a long investigation was permissible[.]"); *cf. Krebsbach*, 617 F. Supp. at 551 ("The Court cannot say that the suspension in the instant case [which plaintiff challenged less than four months after his payments were suspended] has exceeded a reasonable period for the Secretary's investigation."). While APS has suffered a suspension, to date, that is longer than the one at issue in *Krebsbach* but not as long (yet) as the ones in *Alexandre* and *Maynard*, there has also been no investigation conduct by CMS that would plausibly support the suspension. Accordingly, there is

no appropriate governmental investigatory interest supporting the suspension of APS, rendering the suspension entirely inappropriate and unconstitutional.

The question then becomes: What process is due? Whether the process provided is sufficient depends on (1) the "private interest that will be affected by the official action"; (2) the "Government's interest"; and (3) the "risk of an erroneous deprivation of [the private] interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards." *Mickelson*, 823 F.3d at 924 (quoting *Wallin*, 153 F.3d at 690). APS's interest in receiving Medicare payments for the services it has provided far outweighs the government's comparatively minimal interest in withholding *all* of those funds based on a *sliver* of claims that allegedly are fraudulent—particularly where the government has given no explanation for *why* it believes those claims are fraudulent, let alone offered *evidence* to support that belief. Medicare payments amount to approximately 40% of APS's revenue, and without that income, it will be forced out of business. At the end of the day, the "government gets its due sooner or later (with interest)" because APS would have to pay back any funds that it obtained by fraud. *See Sahara Health Care, Inc. v. Azar*, 975 F.3d 523, 530 (5th Cir. 2020). APS, by contrast, may not survive long enough to see the investigation conclude and the suspension lifted. The release of APS's funds at the conclusion of the investigation "will be cold comfort if [APS] has already closed its doors." *Id.*

On very similar facts, the Eighth Circuit held that a doctor who challenged the recoupment of Medicare payments had a "significant interest" in his income that outweighed the government's "relatively slight" interest in "protecting public resources and preventing fraud." *Padda v. Becerra*, 37 F.4th 1376, 1382 (8th Cir. 2022). Dr. Padda said that Medicare payments made up about "33% of his practice's total monthly revenue" and that "[l]oss of this income . . . would force him to

significantly reduce his workforce and the number of patients he treats, and may cause him to close his business." *Id.* Although "Medicare has an interest in protecting public resources and preventing fraud," the Eighth Circuit recognized that "these interests are not as urgent as Dr. Padda's interest" because there is no evidence that "any delay in recovery against Dr. Padda will cause long-term harm to Medicare or prevent Medicare from providing services to other beneficiaries." *Id.*; *accord Sahara Health Care, Inc.*, 975 F.3d at 530 (concluding the "private interest outweighs government interest" where "full recoupment would cause the company to close" and "the government [would] get[] its due sooner or later (with interest)"). So too here.

Next, the court considers the "likelihood of an erroneous deprivation of the private interest involved as a consequence of the procedures used." *Padda*, 37 F.4th at 1383 (quoting *Mickelson*, 823 F.3d at 926). This inquiry looks to "whether the administrative procedures [APS has already received, or those [it] chose to forgo, adequately protect [its] property interest." *Id.* "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews*, 424 U.S. at 333 (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). In this case, the Defendants *failed to follow their own procedures*, and what they did instead falls far short of what due process requires.

A provider may challenge the suspension of payments by submitting a rebuttal statement, and federal regulations require a written response within 15 days that "contain[s] specific findings on the conditions upon which the suspension is initiated, continued, or removed and an explanatory statement of the determination." 42 C.F.R. § 405.375(b)(2). Plaintiff submitted a rebuttal statement and detailed documentary evidence, explaining why the services provided in connection with the five claims were medically necessary. Not only did CMS's contractor respond late (25 days after receiving Plaintiff's rebuttal statement), but more importantly, its response contained no specific

findings or an explanatory statement of why the suspension remains in effect. To this day, APS is chasing ghosts, left with no idea why CMS has frozen millions of dollars in Medicare payments because of $1,400 in claims that allegedly are "Billing for Medically Unnecessary Services." The suspension has now lasted almost eight months, and there is no end in sight. Until APS receives an overpayment determination, there is nothing it can do to receive more process.

The Supreme Court "usually has held that the Constitution requires some kind of a hearing *before* the [government] deprives a person of liberty or property." *Zinermon v. Burch*, 494 U.S. 113, 127–28 (1990) (collecting cases). Although both the Supreme Court and Eighth Circuit have recognized that there may be cases where "something less than an evidentiary hearing may be sufficient prior to adverse administrative action," *Mickelson*, 823 F.3d at 926 (cleaned up) (quoting *Mackey v. Montrym*, 443 U.S. 1, 13 (1979)), *something* is still more than *nothing*.

To date, APS has received no process whatsoever, and the Defendants have failed to fulfill the procedural safeguards that exist to protect providers from an erroneous deprivation. *Cf. Padda*, 37 F.4th at 1383 (finding a "meaningful opportunity to be heard at the first two stages of administrative review," which occurred *before* the government began recouping overpayments and included representation by counsel, submission of written arguments, and "written, reasoned decisions"). Because federal regulations already require a response "contain[ing] specific findings . . . and an explanatory statement of the determination," 42 C.F.R. § 405.375(b)(2), and guarantee that any suspension "be temporary," 42 C.F.R. § 405.372(d)(3)(ii), doing so is obviously not burdensome.

Due process, as noted, requires an opportunity to be heard at a meaningful time and in a meaningful manner, which means in these circumstances that APS should receive a reasoned basis for the suspension and a prompt overpayment determination so that APS can commence the appeal

process. *See, e.g.*, *Barry v. Barchi*, 443 U.S. 55, 66 (1979) (holding post-suspension process "constitutionally infirm" where the person was not "assured a prompt proceeding and prompt disposition" because "[o]nce suspension has been imposed, the [person's] interest in a speedy resolution of the controversy becomes paramount," and there is "little or no state interest . . . in an appreciable delay in going forward with a full hearing"); *Loudermill*, 470 U.S. at 542 ("[I]n *Arnett* six Justices found constitutional minima satisfied where the employee had access to the material upon which the charge was based and could respond orally and in writing and present rebuttal affidavits."). Neither has been provided to APS, and it has therefore been deprived of the Medicare payments it has earned without due process of law. APS's due process claim easily satisfies the fair-chance standard, which requires only "fair ground for litigation" and not even a "fifty percent likelihood of success." *Sleep No. Corp.*, 33 F.4th at 1016–17 (cleaned up) (citations omitted).

### b.    Mandamus Relief

Under the Mandamus Act, district courts "have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." 28 U.S.C. § 1361. Mandamus relief is available when the plaintiff "establish[es] (1) 'a clear and indisputable right to the relief sought,' (2) the [federal] officer 'has a nondiscretionary duty to honor that right,' and (3) there is 'no other adequate remedy.'" *Mitchael v. Colvin*, 809 F.3d 1050, 1054 (8th Cir. 2016) (quoting *Castillo v. Ridge*, 445 F.3d 1057, 1060–61 (8th Cir. 2006)). "[W]hether a writ of mandamus should issue is largely a matter within the district court's discretion." *Castillo*, 445 F.3d at 1061.

APS has a clear and indisputable right to an overpayment determination. The Secretary of Health and Human Servies has promulgated a binding regulatory framework governing the

suspension of payment. *See* 42 C.F.R. §§ 405.370–75 (suspension of payment framework); 42 C.F.R. § 405.1063(a) ("All laws and regulations pertaining to the Medicare and Medicaid programs . . . are binding on ALJs and attorney adjudicators, and the [Medicare Appeals] Council."). That framework culminates in the issuance of an overpayment determination, which is the key to unlocking a provider's appeal rights. Because binding regulations require CMS "to make a determination as to whether an overpayment exists," 42 C.F.R. § 405.372(c)(2), and provide that "all suspensions of payment . . . will be temporary," 42 C.F.R. § 405.372(d)(3)(ii), Plaintiff has a clear right to receive an overpayment determination. *See Gen. Med., P.C. v. Sec'y of U.S. Dep't of Health & Human Servs.*, No. 22-cv-11976, 2023 WL 6164556, at *10 (E.D. Mich. Sept. 21, 2023) ("Plaintiffs sufficiently allege that the Secretary owes them a non-discretionary duty to issue an Overpayment Determination and to thereby make the administrative review process available to them."); *VCP Home Health Care Agency, Inc. v. Sebelius*, No. 3:10-cv-1152, 2011 WL 13290666, at *5 (N.D. Tex. Feb. 10, 2011) ("[Plaintiff] has a clear right to an overpayment determination."). Like two sides of the same coin, CMS has a nondiscretionary duty to provide such a determination. CMS "must" make an overpayment determination, 42 C.F.R. § 405.372(c)(2), and "must" means that it is mandatory. *See Johnson v. Wireman*, 809 F. App'x 97, 100 (3d Cir. 2020) ("'Must', of course, indicates something mandatory."); *SAS Inst., Inc. v. Iancu*, 584 U.S. 357, 362–63 (2018); *FTC v. Tarriff*, 584 F.3d 1088, 1091 (D.C. Cir. 2009); *cf. Mitchael*, 809 F.3d at 1054 (stating that "may" is "permissive" and thus "does not provide the necessary clear and non-discretionary duty for exercise of mandamus jurisdiction"). Finally, Plaintiff has no other adequate remedy. Without an overpayment determination in hand, it cannot exercise its appeal rights. *See* 42 U.S.C. § 1395ff(b); 42 C.F.R. § 405.904.

Plaintiff's mandamus claim readily clears the fair-chance bar, which requires only "fair ground for litigation" and not even a "fifty percent likelihood of success." *Sleep No. Corp.*, 33 F.4th at 1016–17 (cleaned up) (citations omitted).

     **c.**    ***Ultra Vires* Agency Action**

The U.S. Supreme Court has long recognized federal courts' power to issue injunctive relief against agency action taken "in excess of its delegated powers and contrary to a specific prohibition" in the law. *Leedom v. Kyne*, 358 U.S. 184, 188 (1958). For an agency action to be *ultra vires*, there must be a "plain violation of an unambiguous and mandatory provision of the statute." *Key Med Supply, Inc. v. Burwell*, 764 F.3d 955, 962 (8th Cir. 2014) (quoting *Neb. State Legis. Bd. v. Slater*, 245 F.3d 656, 659 (8th Cir. 2001)); *Staege v. U.S. Parole Comm'n*, 671 F.2d 266, 268 (8th Cir. 1982) (stating that a "federal agency[] is obliged to obey its own regulations"); *Voyageurs Region Nat'l Park Ass'n v. Lujan*, 966 F.2d 424, 428 (8th Cir. 1992) ("An agency must indeed follow its own regulations while they remain in force."). This Court also has the authority under the Administrative Procedure Act ("APA") to "strike down as *ultra vires*" agency action that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." *Iowa League of Cities v. EPA*, 711 F.3d 844, 876 (8th Cir. 2013) (quoting 5 U.S.C. § 706(2)(C)).

As explained above, CMS is required to provide an overpayment determination, and in issuing a decision on Plaintiff's rebuttal statement, CMS's contractor was required to send within 15 days a written notice that "contain[ed] specific findings . . . and an explanatory statement of the determination." 42 C.F.R. §§ 405.372(c)(2), 405.375(b)(2). These requirements are clear and use mandatory language (*i.e.*, "must"). *See SAS Inst., Inc.*, 584 U.S. at 362–63; *Johnson*, 809 F. App'x at 100; *Tarriff*, 584 F.3d at 1091. The Defendants' failure to comply with these unambiguous and mandatory regulations is *ultra vires* agency action that this Court should correct by compelling

them to comply with the regulations. *See Nat'l Ass'n of Postal Supervisors v. U.S. Postal Serv.*, 26 F.4th 960, 973 (D.C. Cir. 2022) (explaining that courts may compel an agency to fulfill its statutory obligations). Whether through a common law *ultra vires* theory or the APA, Plaintiff has shown—at the very least—fair ground for litigation on its *ultra vires* claim. *See Sleep No. Corp.*, 33 F.4th at 1016–17.

### d. Unlawful Agency Action Under the Administrative Procedure Act

The APA authorizes federal courts to "hold unlawful and set aside agency action" that is, among other things, "contrary to constitutional right, power, privilege, or immunity"; "without observance of procedure required by law"; or "not in accordance with law." 5 U.S.C. § 706(2). As explained above, the Defendants have violated the Due Process Clause by imposing an indefinite suspension of the Medicare payments APS has earned without due process of law. Nearly eight months have passed, and the Defendants have not provided any explanation for the suspension, nor taken the most basic steps to investigate the five claims they allege are fraudulent. *See supra* Argument Section 2.a. They have also violated binding federal regulations by failing to (1) respond to APS's Rebuttal within 15 days; (2) send a notice "contain[ing] specific findings on the conditions upon which the suspension is initiated, continued, or removed and an explanatory statement of the determination," 42 C.F.R. § 405.375(b)(2); and (3) issue an overpayment determination, 42 C.F.R. § 405.372(c)(2). As such, the continued suspension of APS's Medicare payments is unlawful and contrary to the procedures required by law.

In addition to the power to set aside the suspension, this Court also has the power to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). For relief under § 706(1), a plaintiff must "assert[] that an agency failed to take a *discrete* agency action that it is *required to take*." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004). This test

"precludes . . . broad programmatic attack[s]" and attacks against "action that is not demanded by law (which includes, of course, agency regulations that have the force of law)." *Id.* at 64–65.

The Eighth Circuit has treated the test for mandamus relief and § 706(1) relief as essentially the same. *See Org. for Competitive Markets v. U.S. Dep't of Agric.*, 912 F.3d 455, 462 (8th Cir. 2018) (stating that the outcome is the same regardless of "whether petitioners' claim is reviewed under § 706(1) or as a petition for a writ of mandamus" and observing that "§ 706(1) authorizes courts to 'carr[y] forward the traditional practice prior to its passage, when judicial review was achieved through use of the so-called prerogative writs—principally writs of mandamus under the All Writs Act.'" (quoting *Norton*, 542 U.S. at 63)); *see also Agua Caliente of Cupeno Indians v. Sweeney*, 932 F.3d 1207, 1216 (9th Cir. 2019) (considering the "Mandamus Act, 28 U.S.C. § 1361, and a similar provision of the APA, 5 U.S.C. § 706(1)," together "[b]ecause the relief sought is essentially the same") (citation omitted); *In re La. Pub. Serv. Comm'n*, 58 F.4th 191, 193 (5th Cir. 2023) ("We interpret the All Writs Act and the APA to provide separate, but closely intertwined, grounds for mandamus relief.").

For the reasons explained above, *see supra* Section 2.b, binding regulations require the Defendants "to make a determination as to whether an overpayment exists." 42 C.F.R. § 405.372(c)(2). Because making an overpayment determination is a discrete agency act demanded by binding regulations, and withholding that determination violates those regulations and Plaintiff's due process rights, this Court has the power to compel the Defendants to make an overpayment determination. On this claim, too, Plaintiff has easily shown fair ground for litigation. *See Sleep No. Corp.*, 33 F.4th at 1016–17.

23

3.    **The Equities and Public Interest Weigh Heavily in Favor of an Injunction.**

When the federal government is the party opposing the injunction, the balance-of-the-equities and public-interest factors "merge." *Trump*, 128 F.4th at 996–97. As an initial matter, the "federal officials' interest" in holding onto APS's Medicare funds "is minimal given [APS's] strong likelihood of success in showing" that they have unlawfully withheld those funds. *See id.*; *see also League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) ("[A] high likelihood of success on the merits is a strong indicator that a preliminary injunction would serve the public interest. There is generally no public interest in the perpetuation of unlawful agency action. To the contrary, there is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence.'" (citation omitted)). Nor will the federal government be harmed by releasing APS's property. The "government gets its due sooner or later (with interest)" because APS will have to pay back any funds that it obtained by fraud. *See Sahara Health Care, Inc.*, 975 F.3d at 530. Finally, whatever interests the government may have in combatting Medicare fraud, it has no interest in doing so by unlawfully suspending APS's Medicare payments without due process and in violation of binding federal regulations. *See Kentucky v. Biden*, 23 F.4th 585, 598 (6th Cir. 2022) ("[T]he public's true interest lies in the correct application of the law.").

The federal officials' interests here are especially minimal when measured against the grave harm APS will suffer without an injunction. *See Dataphase Sys.*, 640 F.2d at 113 (stating that, in balancing the equities, courts weigh the "threat of irreparable harm to the movant" against "the injury that granting the injunction will inflict on other parties litigant"). APS will soon cease to exist because the Defendants have unlawfully withheld millions of dollars without explanation or a meaningful opportunity to challenge the deprivation. Releasing the funds will both allow APS to stay in business and rectify the unconstitutional deprivation of those funds. "Surely, upholding

24

constitutional rights serves the public interest." *Newsom v. Albemarle County Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003).

    **4.    The Court Should Consolidate the Preliminary Injunction Hearing with the Trial on the Merits.**

Federal Rule of Civil Procedure 65(a)(2) expressly allows the Court to "advance the trial on the merits and consolidate it with the [preliminary junction] hearing." Plaintiff respectfully suggests that is the best approach here. The Eighth Circuit "ha[s] noted that consolidation under Rule 65 saves time and conserves judicial resources at both the trial and appellate courts." *Campaign for Family Farms v. Glickman*, 200 F.3d 1180, 1185 (8th Cir. 2000). Given that the evidence at the preliminary injunction hearing and the trial on the merits would be largely the same, consolidation is particularly appropriate in this case.[2] *See* Fed. R. Civ. P. 65 advisory committee notes to 1966 amendments ("The authority [to consolidate] can be exercised with particular profit when it appears that a substantial part of evidence offered on the application will be relevant to the merits and will be presented in such form as to qualify for admission [at] trial.").

If the Court decides to consolidate the preliminary injunction hearing with the trial on the merits, it should be sure to provide appropriate notice so that the parties can prepare to present their full case. *See, e.g.*, *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981).

## CONCLUSION

For the reasons above, Plaintiff respectfully requests that this Court issue an injunction, ordering the Defendants to release Plaintiff's seized property immediately and issue an

---

[2] For a permanent injunction, Plaintiff would need to "show actual success on the merits." *Religious Sisters of Mercy v. Becerra*, 55 F.4th 583, 608 n.14 (8th Cir. 2022) (quoting *Miller v. Thurston*, 967 F.3d 727, 735 (8th Cir. 2020)). Plaintiff has made a showing of actual success on the merits. *See supra* Argument Section 2.

Plaintiff expressly reserves the right to conduct discovery if the Defendants argue in response to this motion that they have been conducting an investigation.

overpayment determination so that, if necessary, Plaintiff can know and rebut transparently the basis for the Defendants' suspension.

COZEN O'CONNOR

Dated:  March 20, 2025

By: */s/ Dustin McDaniel*
Dustin McDaniel
Bar No. 99011
*Attorney for Plaintiff,*
*Advanced Pathology Solutions, PLLC*
Cozen O'Connor
1307 W. 4th Street
Little Rock, Arkansas 72201
Tel: (501) 404-4010
E-mail: dmcdaniel@cozen.com

Arthur P. Fritzinger
Penn. Bar No. 309533
*Admitted pro hac vice*
*Attorney for Plaintiff,*
*Advanced Pathology Solutions, PLLC*
Cozen O'Connor
1650 Market Street, Suite 2800
Philadelphia, Pennsylvania 19103
Tel: (215) 665-7264
E-mail: afritzinger@cozen.com