UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

**ADVANCED PATHOLOGY**                                          **PLAINTIFF**
**SOLUTIONS, PLLC**
**v.**                          **No. 4:25-CV-229 JM**

**ROBERT F. KENNEDY, in his**                                  **DEFENDANTS**
**official capacity as Secretary**
**of the United States**
**Department of Health &**
**Human Services; and**
**DR. MEHMET OZ, in his**
**official capacity as Administrator**
**of the Centers for Medicare and**
**Medicaid Services**

## DEFENDANTS' BRIEF IN SUPPORT OF MOTION TO DISMISS AND RESPONSE TO MOTION FOR PRELIMINARY AND PERMANENT INJUNCTION

Plaintiff Advanced Pathology Solutions, PLLC ("APS") filed this action challenging a temporary suspension of its Medicare payments after the Centers for Medicare and Medicaid Services ("CMS") found that credible allegations of fraud exist that APS billed for medically unnecessary services. However, the Court does not have subject matter jurisdiction over this action because a temporary payment suspension is not a reviewable final agency decision. Accordingly, the United States of America, on behalf of Robert F. Kennedy, in his official capacity as Secretary for the United States Department of Health and Human Services ("HHS"), and Dr. Mehmet Oz, in his official capacity as Administrator of CMS, move to dismiss this action pursuant to Fed. R. Civ. P. 12(b)(1). Alternatively, even if the Court has jurisdiction, the Court should dismiss the Complaint pursuant to Fed. R. Civ. P. 12(b)(6) for failure to plead a claim for relief. Moreover, if the Court does not dismiss the Complaint, the Court should deny APS's motion for a preliminary and permanent injunction because APS has not met its burden to establish that this extraordinary remedy is appropriate here. Of note, although APS claims it was

"forced to liquidate" a portion of its business to save itself from "the brink of financial ruin," in fact, APS used the proceeds of the liquidation to make multi-million-dollar payouts to its individual owners and transferred many of APS's ongoing operations to a different company also under the individual owners' control in an effort to evade the payment suspension. The Court should rebuff APS's efforts to use this action and the present motion to evade a Congressionally-authorized administrative process and gain a tactical advantage in responding to the government's ongoing investigation of its allegedly fraudulent Medicare billing practices.

## BACKGROUND

### I.    Administrative Framework

The Medicare program pays for covered medical items and services provided to eligible beneficiaries. 42 U.S.C. §§ 1395, *et seq*. CMS, a component of HHS, administers the Medicare program. Congress gave CMS broad authority to regulate Medicare reimbursement to prevent fraud, waste, and abuse. *Id*. §§ 1395hh(a)(1), 1395ddd. Pursuant to this authority, CMS has promulgated detailed regulations designed to combat Medicare billing fraud, and CMS contracts with private entities who work to promote the integrity of the Medicare program. *Id*. § 1395ddd(a); *see* 42 C.F.R. Part 405, Subpart C.

One tool that CMS and its program integrity contractors use to protect Medicare funds is a temporary payment suspension. 42 U.S.C. § 1395y(o); 42 C.F.R. §§ 405.370-405.375. Temporary payment suspensions allow CMS to withhold Medicare payments to a healthcare provider pending an investigation into the propriety of the claims submitted by the provider. 42 U.S.C. § 1395y(o)(1). One purpose of a payment suspension is "to protect the government from suffering greater losses." *Clarinda Home Health v. Shalala*, 100 F.3d 526, 529 (8th Cir. 1996).

Specifically, CMS is authorized to impose a temporary payment suspension if it or one of its program integrity contractors determines that a "credible allegation of fraud exists against a provider or supplier." 42 C.F.R. § 405.371(a)(2); *see also* 42 U.S.C. § 1395y(o)(1); 42 C.F.R. § 405.370. A "credible allegation of fraud" is "an allegation from any source, including . . . civil false claims cases, and law enforcement investigations." 42 C.F.R. § 405.370(a). In determining whether there is a credible allegation of fraud, CMS consults with the Office of Inspector General of HHS ("OIG"), 42 U.S.C. § 1395y(o)(2), and "as appropriate," the Department of Justice ("DOJ"), 42 C.F.R. § 405.371(a)(2). However, authority over a Medicare payment suspension rests at all times with CMS, which is "the real party in interest" and "responsible" for the payment suspension. *See* 42 C.F.R. § 405.372(a)(4).

For a payment suspension based on credible allegations of fraud, CMS is not required to issue notice to the provider prior to implementing the suspension. *Id.* § 405.372(a)(4). If a payment suspension is put into effect without prior notice, the Medicare contractor must give the provider an opportunity to submit a rebuttal statement as to why the suspension should be removed. *Id.* § 405.372(b)(2). After receiving a rebuttal statement, CMS or its contractor "must within 15 days, from the date the statement is received, *consider* the statement (including any pertinent evidence submitted), together with any other material bearing upon the case, and determine whether the facts justify the suspension." *Id.* § 405.375(a) (emphasis added). Subsequently, the contractor must send written notice of its determination to the provider. *Id.* § 405.375(b). The determination is "not an initial determination and is not appealable." *Id.* § 405.375(c); *see also id.* § 405.924 (listing actions that are appealable initial determinations).

Every 180 days, CMS reevaluates the suspension and requests a certification from the OIG (or other law enforcement agency, if applicable) that the suspended provider remains under

investigation. *Id.* § 405.371(b)(2). When a law enforcement agency is investigating the billing conduct of the healthcare provider, CMS can continue the suspension until resolution of the law enforcement investigation. *Id.* § 405.372(d)(3). "An investigation of credible allegations of fraud will be considered resolved when legal action is terminated by settlement, judgment, or dismissal, or when the case is closed or dropped because of insufficient evidence to support the allegations of fraud." *Id.* § 405.370(a).

During the suspension, CMS processes and holds payment for claims submitted by the healthcare provider. *See True Health Diagnostics, LLC v. Azar*, 392 F. Supp. 3d 666, 677 (E.D. Tex. 2019) (explaining payment is "effectively held in escrow, until the investigation is completed"). When a payment suspension terminates, any suspended funds are first applied to reduce or eliminate any obligation, including overpayment debts, owed by the provider to CMS or HHS. 42 C.F.R. § 405.372(e). If CMS issues an overpayment determination, the Medicare Act entitles the provider to a four-part review process culminating in judicial review. 42 U.S.C. § 1395ff(b)(1)(A) (incorporating judicial review provision of the Social Security Act, 42 U.S.C. § 405(g)); 42 C.F.R. § 405.904(a)(2) (describing administrative appeals process). "In the absence of a legal requirement that the excess be paid to another entity, the excess is released to the provider or supplier." 42 C.F.R. § 405.372(e).

## II.    Factual Background

On August 8, 2024, CMS, through its program integrity contractor, Qlarant Integrity Solutions, LLC ("Qlarant"), issued a Notice of Suspension of Medicare Payments to APS (the "Suspension Notice"). *See* Motion for Preliminary and Permanent Injunction, ("Pl.'s Mot."), Ex. 1, Doc. 9-2. The Suspension Notice stated that CMS suspended Medicare payments to APS

based on credible allegations of fraud pursuant to 42 C.F.R. § 405.371(a)(2) (citing 42 C.F.R. § 405.370(a)):

> Specifically, the suspension of Medicare payments to Advanced Pathology Solutions is based on, but not limited to, information that you misrepresented services billed to the Medicare program. More particularly, Advanced Pathology Solutions is billing for medically unnecessary services. Additionally, APS has entered into arrangements to set up mini labs or "Lean Labs" at a reduced cost in numerous healthcare providers' offices in order to increase the amount of referrals to APS.

"[B]y way of example," the Suspension Notice cited a "list [that] is not exhaustive or complete" of five claims submitted by APS to CMS. The Suspension Notice advised that "the investigation into this matter is continuing," the suspension may last until the resolution of the investigation as defined under 42 C.F.R. § 405.370, and the suspension may be extended under certain circumstances under 42 C.F.R. § 405.372(d)(3). Citing 42 C.F.R. § 405.375(b)(2), the Suspension Notice informed APS of its right to submit a rebuttal statement with supporting evidence and explained that CMS's rebuttal determination was not an appealable initial determination.

On August 16, 2024, APS submitted a rebuttal statement, undated letters from two APS pathologists associated with the five sample claims, and a September 2014 letter from the College of American Pathologists discussing a draft Medicare Local Coverage Determination. Pl.'s Mot., Ex. 2, Doc. 9-3. APS did not include any supporting medical records.

On August 23, 2024, Qlarant notified APS that it received APS's August 16, 2024 rebuttal statement and materials on August 19, 2024, and had begun its review. *See* Declaration of Sherri G. McQueen ("McQueen Decl."), attached as Exhibit A to Defendant's Motion to Dismiss, ¶¶ 7-8.

On September 13, 2024, Qlarant responded by letter to APS on behalf of CMS, explaining that "[a]fter careful review of the information provided, [CMS] has determined that the suspension of Medicare payments to APS will continue." Pl.'s Mot., Ex. 3, Doc. 9-4. CMS then addressed each of the points raised by APS in the rebuttal statement. Specifically, CMS noted that the Suspension Notice provided APS with specific examples of the conduct at issue, including citing a "non-exhaustive list of example claims to which the credible allegations of fraud apply." *Id.* CMS explained that, for laboratory testing providers like APS, CMS must "verify that the supporting authenticated medical record documentation contains sufficient information supporting the ordered/provided tests are reasonable and necessary per 42 C.F.R. § 410.32." *Id.* Yet, APS's "narrative" rebuttal statement and "undated physician statements"—without supporting medical record documentation—are "insufficient to support the medical necessity of the services provided." *Id.* ("[T]he fact that a treating physician ordered a particular service does not alone establish that the service was medically necessary."). APS also failed to provide any documentation substantiating its claims regarding its "Lean Lab" arrangements with referring providers. *Id.* CMS noted that, prior to implementing the payment suspension, it made an individualized assessment "that there are enough pathologists and laboratories offering pathology services to Medicare beneficiaries in the area served by APS." *Id.*; *see also* McQueen Decl., Ex. A, ¶¶ 5-6. Accordingly, CMS informed APS that the suspension would continue until the resolution of the investigation into APS's Medicare payments.

On January 24, 2025, CMS notified APS that, pursuant to 42 C.F.R. § 405.371(b), the payment suspension would remain in place while the investigation of the credible allegations of fraud continues. Pl.'s Mot., Ex. 4, Doc. 9-5. CMS explained: "CMS regulations authorize payment suspensions based on credible allegations of fraud to continue until resolution of the

investigation including termination of any civil or criminal proceedings. *Id.* (citing 42 C.F.R. §§ 405.370 & 405.372(d)(3)(ii)).

As APS is well aware, the Suspension Notice arose out of the United States' ongoing investigation under the False Claims Act, 31 U.S.C. §§ 3729-3733 ("FCA"), of allegations that APS defrauded the Medicare program, among other federal healthcare programs, by causing the submission of claims to CMS for pathology services that were not medically reasonable or necessary, as well as for providing unlawful kickbacks to providers to induce referrals of beneficiaries to APS for pathology services.[1] The United States has served three Civil Investigative Demands ("CIDs") on APS and seventeen CIDs on APS's owners and employees, seeking document productions, interrogatory responses, and sworn testimony. To date, the United States has taken testimony under oath from seven current and former APS owners and employees. The United States has communicated extensively with counsel for APS about substantive issues related to the investigation, including detailing the conduct under investigation over the course of numerous meetings. Of note, a special agent and a senior counsel with HHS-OIG attended one of those meetings with APS's counsel on May 1, 2024. ███████████████ ███████████████████████████████████████ ███████████████████████████████████████ ███████████████████████████████████████ ██████████████████████████████ The investigation is still active as of the date of this filing.

---

[1] Because APS mischaracterized the United States' investigation in its brief, some factual context is necessary. However, the limited discussion herein of the ongoing investigation does not reflect the full scope of the investigation, nor is the investigation necessarily limited to the conduct discussed herein. At this time, the United States does not intend to disclose all details regarding its investigation, nor is this the forum to adjudicate any fraud allegations on the merits.

## ARGUMENT

**I.    The Court Must Dismiss This Action Pursuant to Rule 12(b)(1) Because the Court Lacks Subject Matter Jurisdiction.**

The Court does not have subject matter jurisdiction over APS's lawsuit challenging an unreviewable agency action, and accordingly, the Court must dismiss the Complaint pursuant to Fed. R. Civ. P. 12(b)(1). "Federal courts are courts of limited jurisdiction, possessing only that power authorized by Constitution and statute," *Gunn v. Minton*, 568 U.S. 251, 256 (2013) (internal quotation marks and citation omitted), and "[i]t is well established that a court has a special obligation to consider whether it has subject matter jurisdiction in every case," *Hart v. United States*, 630 F.3d 1085, 1089 (8th Cir. 2011). Subject matter jurisdiction presents "a question of justiciability" and concerns "the constitutional power of a federal court to resolve a dispute and the wisdom of so doing." *Miller v. Redwood Toxicology Lab., Inc.*, 688 F.3d 928, 934 (8th Cir. 2012) (second quote quoting *Graden v. Conexant Sys., Inc.*, 496 F.3d 291, 295 (3d Cir. 2007)). At all times, "[t]he plaintiff bears the burden to establish subject matter jurisdiction." *Two Eagle v. United States*, 57 F.4th 616, 620 (8th Cir. 2023). In addition, "subject-matter jurisdiction, because it involves a court's power to hear a case, can never be forfeited or waived." *United States v. Cotton*, 535 U.S. 625, 630 (2002). "[W]hen a federal court concludes that it lacks subject-matter jurisdiction, the court must dismiss the complaint in its entirety." *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006). Likewise, a motion for preliminary and permanent injunction must be denied when a court lacks subject matter jurisdiction. *See Clarinda*, 100 F.3d at 531.

Subject matter jurisdiction may be challenged "on its face or on the factual truthfulness of its averments." *Titus v. Sullivan*, 4 F.3d 590, 593 (8th Cir. 1993); *see also Osborn v. United States*, 918 F.2d 724, 729 n.6 (8th Cir. 1990). If, as here, a party asserts a factual challenge, the

Court may consider matters outside the pleadings, *Moss v. United States*, 895 F.3d 1091, 1097 (8th Cir. 2018); *Two Eagle*, 57 F.4th at 620 (citing *Croyle by & through Croyle v. United States*, 908 F.3d 377, 381 (8th Cir. 2018)), and the plaintiff loses the benefit of favorable inferences from its factual allegations, *Titus*, 4 F.3d at 593 n.1; *see also Harris v. P.A.M. Transport, Inc.*, 339 F.3d 635, 637 n.4 (8th Cir. 2003) (noting a factual challenge "does not . . . convert the 12(b)(1) motion to one for summary judgment"). A federal court must dismiss the action if, at any time, the court determines that it lacks subject-matter jurisdiction. Fed. R. Civ. P. 12(h)(3); *see* Fed. R. Civ. P. 12(b)(1).

A.    **The Court Lacks Subject Matter Jurisdiction Over APS's Challenge to a Non-Final Agency Action.**

Where, as here, a lawsuit presents claims arising under the Medicare Act, the plaintiff must exhaust all administrative remedies and obtain a final agency decision before the Court can assert subject matter jurisdiction. A claim "arises under" the Medicare Act if the Medicare Act is "both the standing and the substantive basis for the presentation" of the claim, or if the claim is "inextricably intertwined" with Medicare payment. *Heckler v. Ringer*, 466 U.S. 602, 614-15 (1984); 42 U.S.C. § 405(h) (made applicable to the Medicare Act by 42 U.S.C. § 1395ii). For Medicare Act claims, complainants must establish jurisdiction under § 405(g), which read together with § 405(h),[2] requires the exhaustion of administrative remedies before judicial review is available. *See Shalala v. Ill. Council on Long Term Care, Inc.*, 529 U.S. 1, 5, 15 (2000) ("We conclude that the statutory provision at issue, § 405(h), as incorporated by § 1395ii, bars federal-question jurisdiction here. The [plaintiff] . . . must proceed instead through the special review channel that the Medicare statutes create." (citing 42 U.S.C. §§ 1395cc(h), (b)(2)(A),

_____

[2] 42 U.S.C. § 1395ff(b)(1)(A) applies 42 U.S.C. § 405(g) to Medicare reimbursement actions. 42 U.S.C. § 1395ii applies 42 U.S.C. § 405(h) to the Medicare Act.

1395ii; §§ 405(b), (g), (h))); *Heckler*, 466 U.S. at 627. "Because exhaustion requirements are designed to deal with parties who do not want to exhaust, administrative law creates an incentive for those parties to do what they would otherwise prefer not to do, namely, to give the agency a fair and full opportunity to adjudicate their claims." *Woodford v. Ngo*, 548 U.S. 81, 90 (2006).

A temporary payment suspension is not a final agency decision over which this Court has jurisdiction. *See* 42 C.F.R. § 405.375(c); *Clarinda*, 100 F.3d at 530-31 (holding that the court does not have subject matter jurisdiction over an action challenging a temporary Medicare payment suspension before the agency had made a final overpayment determination). Rather, a provider must first obtain an overpayment decision from the agency after the United States completes its investigation and then proceed through the mandatory four-part review process in the Medicare Act before seeking judicial review of claims arising under the Medicare Act. 42 U.S.C. §§ 1395ff(b)(1)(A), 1395ii (incorporating 42 U.S.C. § 405(h)); *see Reg'l Home Health Care, Inc. v. Azar*, 488 F. Supp. 3d 827, 832 (D. Iowa 2020) (describing appeals process), *aff'd sub nom. Reg'l Home Health Care, Inc. v. Becerra*, 19 F.4th 1043 (8th Cir. 2021). These regulations provide the exclusive, mandatory appeals process for administrative review.

Here, without question, the "substantive basis" for APS's claims is the Medicare Act. *Heckler*, 466 U.S. at 614-15. Counts I to V all challenge CMS's temporary suspension of Medicare funds that APS alleges it is owed. *See* Compl. ¶¶ 39-84. In support of those allegations, APS contends that the continued suspension of Medicare funds is unjustified and counter to federal law. *Id.* at 1-3; *see also id.* ¶¶ 15-11. Then, in the Prayer for Relief, APS seeks a preliminary and permanent injunction of the temporary payment suspension, a declaration that the temporary payment suspension is unlawful, an order that CMS immediately release all currently suspended funds to APS, and a writ of mandamus that CMS issue an overpayment

decision. *Id.* at 19-20. Because APS's claims arise under the Medicare Act, judicial review is not available until after APS exhausts all administrative remedies and obtains a final agency decision. 42 U.S.C. §§ 1395ff(b)(1)(A), 1395ii; *see also* § 405(g)–(h).[3] APS has not done so here, where it seeks to challenge a temporary payment suspension before CMS has determined whether an overpayment debt exists.

As the Eighth Circuit explained in *Clarinda* in dismissing a provider's challenge to a temporary Medicare payment suspension:

> [T]here has been no final determination of whether the payments will eventually be made to Clarinda. Instead, the payments have been only temporarily suspended during an ongoing fraud investigation. Upon the conclusion of the investigation, if it is determined that Clarinda did not commit any fraudulent acts, the withheld funds will be immediately dispersed to Clarinda. The withholding is nothing more than a temporary measure necessary to maintain the status quo while the necessary facts are gathered and evaluated.

> If the Secretary finds evidence of fraud, the Secretary may then make a final determination to exclude Clarinda from the Medicare program. After the Secretary's final determination, Clarinda will be given notice and a hearing. If the Secretary's decision is upheld, Clarinda then will be entitled to notice, a post-exclusion hearing pursuant to 42 U.S.C. § 405(b), and judicial review pursuant to 42 U.S.C. § 405(g). Therefore, Clarinda will have its day in court after the Secretary has rendered her final decision.

---

[3] Section 405(g)—on its face—only applies to "final decision[s] of the Commissioner of Social Security." Congress allows a claimant challenging an initial determination of a Medicare reimbursement claim to seek "judicial review of the Secretary's final decision after such hearing as provided in section 405(g)." 42 U.S.C. § 1395ff(b)(1)(A). However, Congress only allows for section 405(g) review when a claimant first receives a redetermination decision on its claim. *Id.* § 1395ff(a)(3)(B)(i). Section 1395ff(a)(3)(B)(i) states that "[n]o initial determination may be reconsidered or appealed under subsection (b) [which includes judicial review] unless the fiscal intermediary or carrier [i.e., the Medicare contractor] has made a redetermination of that initial determination under this paragraph." Here, APS has not pled, alleged, or argued that the temporary payment suspension was an initial determination or that it received a redetermination decision on that decision. Therefore, there is no jurisdiction under section 405(g) because Plaintiff has not met Congress' explicit requirements for a section 405(g) review in section 1395ff.

*Clarinda*, 100 F.3d at 530.[4] Likewise, in the present action, APS cannot challenge a temporary suspension of its Medicare payments based on credible allegations of fraud in this Court until after APS exhausts its administrative remedies and the agency makes a final overpayment determination.

APS attempts to distinguish *Clarinda* to avoid the same outcome, but those attempts ring hollow: APS is situated the same as the plaintiff in *Clarinda*, and the outcome must be the same. <u>*First*</u>, APS contends that the present action is distinguishable because CMS suspended all Medicare payments to APS. *See* Pl.'s Br., Doc. No. 10, at 14. But *Clarinda* also involved a suspension of "all payments to Clarinda for services billed to the Medicare program." *See Clarinda,* 100 F.3d at 527. <u>*Second*</u>, APS posits, without support, that defendants have "indefinitely" suspended payments to APS. Pl.'s Br., Doc. No. 10, at 15. This is not the case. As in *Clarinda*, APS's "payments have been only temporarily suspended during an ongoing fraud investigation." *See Clarinda*, 100 F.3d 530; Pl.'s Inj. Mot, Ex. 1, Doc. 9-2. <u>*Third*</u>, APS contends that defendants "have taken no steps to conduct an investigation." Compl., Doc. No. 1, ¶ 75; *see also* Pl.'s Br., Doc. No. 10, at 15. This untruthful assertion is demonstrably false. Before APS filed the present action, the United States had served 20 CIDs on APS and its owners and employees in connection with an ongoing investigation of APS's Medicare billing practices. The

---

[4] Numerous federal courts have dismissed similar challenges to a temporary CMS payment suspension for lack of jurisdiction. *See, e.g.*, *Brooks Home Care Servs., Inc. v. Becerra*, No. 23CV-0477, 2024 WL 1348426 (N.D. Tex. Mar. 29, 2024); *San Diego Comprehensive Pain Mgt. Ctr. v. Becerra*, No. 21-cv-01739, 2021 WL 5741465 (S.D. Cal. Dec. 2, 2021); *Reg'l Home Health Care, Inc. v. Azar*, 488 F. Supp. 3d 827 (S.D. Iowa 2020); *Naushad v. U.S. Dep't. of Health & Human Servs.*, No. 4:20-CV-00018, 2020 WL 2800381 (E.D. Mo. May 29, 2020); *Simply Home Healthcare, LLC v. AdvanceMed Corp.*, No. 19-C-2313, 2020 WL 419416 (N.D. Ill. Jan. 27, 2020); *PainMD, LLC v. Azar*, No. 18-cv-01346, 2019 WL 4016120 (M.D. Tenn. Aug. 26, 2019); *MedPro Health Providers, LLC v. Hargan*, No. 17 C 1568, 2017 WL 4699239 (N.D. Ill. Oct. 19, 2017); *Integrated Nursing & Health Servs. Inc. v. Centers for Medicare & Medicaid Servs.*, No. 17-683, 2017 WL 1373265 (D. Minn. Apr. 13, 2017).

same week that APS filed the present action, the United States took CID testimony under oath from five owners of APS, including CEO Kevin Hannah, in connection with its investigation of APS's Medicare billing practices. To the extent that APS is splitting hairs to contend that an investigation of APS's Medicare billing fraud involving the DOJ is independent of investigative activity by HHS or CMS, *see* Compl., Doc. No. 1, ¶¶ 18, 31-34, that argument fails. As the law enforcement agency of the United States, the DOJ investigates potential violations of law on behalf of its client agencies—just as the DOJ responds to actions like this one on behalf of those same agencies. In fact, the FCA specifically tasks the DOJ with investigating and litigating potential FCA actions on behalf of other federal agencies. *See* 31 U.S.C. § 3730(a).

Besides, APS is well aware that the DOJ is investigating its Medicare billing practices on behalf of HHS and CMS. Prior to APS's filing of this action, the DOJ advised APS on multiple occasions that CMS and HHS are among its clients in this investigation, and a senior counsel and a special agent from HHS-OIG participated in a liability presentation that DOJ made to APS in May 2024. It also is not true that the DOJ has "denied any involvement whatsoever in the suspension." Pl.'s Br. at 5 n.1. As the DOJ has explained to counsel for APS numerous times, the temporary payment suspension is an administrative remedy within CMS's authority based on facts uncovered during the DOJ's investigation. At all times, the payment suspension—as an administrative measure—remains under the authority of CMS. 42 C.F.R. § 405.372(a)(4)(iii).[5]

---

[5] It is not uncommon for CMS to implement a payment suspension during an ongoing civil or criminal fraud investigation. *See, e.g.*, *Ctr. for Dermatology & Skin Cancer, Ltd. v. Burwell*, 770 F.3d 586, 587-88 (7th Cir. 2014) (reciting United States' indictment of provider for Medicare fraud and Medicare payment suspension implemented by CMS); *Clarinda*, 100 F.3d at 527-28 (noting that payment suspension was implemented upon reliable evidence of fraud yielded by an investigation by the DOJ and FBI); *United States v. Cent. Med. Sys., LLC*, No. 14-cv-512, 2018 WL 5112911, at *2 (M.D. Fla. Oct. 19, 2018) (referencing United States' intervention in civil *qui tam* suit against provider and Medicare payment suspension implemented by CMS).

Under Medicare regulations, CMS may delay issuing a final overpayment determination until the investigation is resolved. *Id.* § 405.372(c)(2)(ii).

While the Complaint contends that APS "has no further administrative remedies to exhaust," Compl., Doc. No. 1, ¶ 38; *see also id.* ¶ 52 (arguing exhaustion is unnecessary), the simple fact is that APS has *not* exhausted its administrative remedies. Because the temporary payment suspension and related fraud investigation are still ongoing, CMS has not issued an initial overpayment determination that would allow APS to begin seeking an administrative remedy—much less a "final agency action" that APS could challenge in federal court. *See* Suspension Notice, Pl.'s Mot., Ex. 1, Doc. No. 9-2; Compl., Doc. No. 1, ¶ 48. Until APS has exhausted its administrative remedies as required by § 405(g), which is the sole source of jurisdiction over Medicare matters, this Court lacks subject matter jurisdiction over APS's claims, and the Complaint should be dismissed. 42 U.S.C. §§ 1395ff(b)(1)(A), 1395ii (incorporating 42 U.S.C. § 405(g)-(h)).

**B.    APS Cannot Establish Subject Matter Jurisdiction Based on Any Narrow Exception.**

In apparent concession that the Court lacks subject matter jurisdiction under § 405(g), the Complaint pleads subject matter jurisdiction solely by relying on narrow exceptions applicable to parties that have not exhausted administrative remedies. Specifically, APS alleges subject matter jurisdiction based on (1) "the preclusion-of-judicial review exception under 28 U.S.C. § 1331"; (2) "the collateral-claim exception under 42 U.S.C. § 405(g)"; and (3) "the Mandamus Act, 28 U.S.C. § 1361." *See* Compl., Doc. No. 1, ¶ 2. As explained below, none of these authorities provides any basis for the Court to exercise jurisdiction here.

1.    *The Preclusion of Judicial Review Exception Does Not Apply.*

APS attempts to ground jurisdiction in 28 U.S.C. § 1331 (federal question jurisdiction), *see* Compl., Doc. No. 1, ¶ 2, in spite of the Medicare Act's jurisdictional bar precluding suits under § 1331, *see* 42 U.S.C. § 405(h) ("No action . . . shall be brought under section 1331 . . ."); 42 U.S.C. § 1395ii (incorporating 42 U.S.C. § 405(h)); *Total Renal Labs., Inc. v. Shalala*, 60 F. Supp. 2d 1323, 1329 (N.D. Ga. 1999) (finding no federal question jurisdiction under § 1331 over complaint challenging temporary Medicare payment suspension). Specifically, APS asserts it has a right to judicial review before an overpayment debt has been determined based on an exception to administrative exhaustion requirements that arises only if the administrative review process forecloses *any possibility* of judicial review. *See* Compl., Doc. No. 1, ¶ 2 (citing *Bowen v. Mich. Acad. of Family Physicians*, 476 U.S. 667 (1986)). But this exception is "extremely narrow" and applies "only when channeling a claim through the administrative review process would mean no review at all." *Reg'l Home Health Care*, 488 F. Supp. 3d at 837 (quoting *Ill. Council*, 529 U.S. at 19). In other words, the exception applies only if the agency's procedures create "*complete* preclusion of judicial review." *Ill. Council*, 529 U.S. at 22-23 (emphasis in original).

Yet, APS does not plead that there is no possibility of judicial review. Instead, APS complains that it cannot obtain judicial review as *quickly* as it would like. This does not amount to preclusion of judicial review. *See Heckler*, 466 U.S. at 627 ("Congress must have felt that cases of individual hardship resulting from delays in the administrative process had to be balanced against the potential for overly casual or premature judicial intervention in an administrative system that processes literally millions of claims every year. If the balance is to be struck anew, the decision must come from Congress and not from this Court."). As the Supreme Court has recognized, participation in a "massive, complex health and safety program such as Medicare" comes with the tradeoff of "delay-related hardships"—including the potential for

payment suspensions—but those delays do not amount to preclusion of judicial review. *See Ill. Council*, 529 U.S. at 13.

### 2.   *The Collateral Claim Exception Does Not Apply.*

Next, APS relies on the "collateral claim" exception, which applies if a plaintiff "(1) raises a colorable constitutional claim collateral to [its] substantive claim of entitlement; (2) shows that irreparable harm would result from exhaustion; and (3) shows that the purposes of exhaustion would not be served by requiring further administrative procedures." *Anderson v. Sullivan*, 959 F.2d 690, 693 (8th Cir. 1992) (citation omitted).

APS cannot make such a showing here. It simply "is not a colorable constitutional violation of due process to withhold payments temporarily to a provider without a hearing." *See Clarinda*, 100 F.3d at 531; *see also Reg'l Home Health Care,* 488 F. Supp. 3d at 837 (concluding that "*Clarinda* is dispositive"); *Peterson v. Weinberger*, 508 F.2d 45, 50 (5th Cir. 1975) (finding Medicare provider has no due process right to a hearing during the course of an investigation for acts of fraud and misrepresentation). In fact, even APS concedes that "there is no constitutionally protected interest in funds that are *temporarily* withheld during an *active* fraud investigation." Pl.'s Br., Doc. No. 10, at 14 (emphasis in original). While APS goes on to claim that the suspension is not actually temporary and that there is no active fraud investigation, these assertions are belied by reality, as explained in Part I.A, *supra*. Moreover, APS cannot have a due process interest in suspended payments that very well may have been submitted for *false* claims, as APS is not entitled to *any* payment for false claims. APS has no constitutionally protected interest here—and that should be the end of the matter.

Nor can APS demonstrate irreparable harm (as discussed, *infra*, in Part III.B) or that the purposes of exhaustion would not be served by requiring further administrative procedures. As discussed above, the administrative scheme reflects the intentional balance that Congress struck

between the potential for hardship caused by administrative delays and the downside of premature judicial intervention in the regulatory process. *See generally* 42 U.S.C. § 1395ddd(a); 42 C.F.R. Part 405, Subpart C. APS should not be allowed to circumvent the temporary payment suspension based on credible allegations that it committed fraud or the Congressionally-authorized administrative process before the government concludes its investigation into whether APS caused the submission of false claims for payment to CMS.

### 3.    *The Court Does Not Have Mandamus Jurisdiction.*

Alternatively, APS asserts that the Court has jurisdiction pursuant to the Mandamus Act, 28 U.S.C. § 1361, which provides that "district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." Courts "may grant a writ of mandamus only in extraordinary situations and only if: (1) the petitioner can establish a clear and indisputable right to the relief sought, (2) the defendant has a nondiscretionary duty to honor that right, and (3) the petitioner has no other adequate remedy." *Castillo v. Ridge*, 445 F.3d 1057, 1060-61 (8th Cir. 2006) (citation omitted). APS fails to meet this heavy burden here.

<u>First</u>, APS cannot show that it has a "clear and indisputable right" to the relief sought—that is, termination of the temporary payment suspension. The law is clear: "[t]he rescission of the suspension and the issuance of a final overpayment determination to the provider or supplier may be delayed until resolution of the investigation." 42 C.F.R. § 405.372(c)(ii); *Naushad*, 2020 WL 2800381, at *4 ("CMS has no obligation under 42 C.F.R. § 405.372(c)(2) to make any final determinations or lift the suspension before the investigation of [a provider] is resolved, which includes the pendency of a civil or criminal action.").

*Second*, even if APS could establish a clear and indisputable right to the relief sought, which it cannot do here, APS also cannot demonstrate that Defendants have a "clear, nondiscretionary duty" to honor that right. "[T]he decision to suspend payment or to continue a payment suspension is made at the sole discretion of CMS." *Naushad*, 2020 WL 2800381, at *4; *Integrated Nursing & Health Servs. Inc.*, 2017 WL 1373265, at *3; *see also* 42 C.F.R. § 405.371 (providing CMS "may" suspend Medicare payments in certain circumstances and "may" decide not to suspend payments "for good cause.").

*Third*, APS cannot demonstrate that it has no other adequate remedy. If APS is dissatisfied with the temporary payment suspension, APS can and must pursue administrative relief before seeking judicial review. 42 C.F.R. § 405.904(a)(2) (describing four-step administrative review); *see also Naushad*, 2020 WL 2800381, at *4 & n.1 (finding plaintiff "failed to demonstrate that it has no remedy other than mandamus because it has not even begun the four-part administrative review process provided by the Medicare Act") (citing 42 U.S.C. § 405(g) (requiring administrative exhaustion as a prerequisite for claims arising under the Medicare Act))). In denying mandamus relief to challenge a Medicare payment suspension, courts have explained: "[t]he delay in review—and the resulting hardship—caused by requiring [plaintiff] to wait for an overpayment determination so it can raise and exhaust its claims before the agency . . . does not, without more, warrant a waiver of the exhaustion requirement." *MedPro Health Providers*, 2017 WL 4699239, at *5 (declining to "upset the balance Congress chose to strike between the competing considerations of individual hardship and systemic efficiency"). Thus, mandamus relief is not warranted under these circumstances.[6]

---

[6] In Count III, APS alleges that the payment suspension is an *ultra vires* agency action under the Administrative Procedure Act ("APA"). To the extent that APS seeks to rely on the *ultra vires* doctrine to establish jurisdiction, this argument must fail. *Heckler*, 466 U.S. at 622 ("It would be anomalous indeed for this Court to breathe life into . . . [an] already discredited statutory

II.     **The Court Should Dismiss the Complaint under Rule 12(b)(6) for the Alternatively Sufficient Reason that It Fails to Plead a Claim for Which Relief Can Be Granted.**

Alternatively, even if the Court has subject matter jurisdiction, which it does not, the Court should dismiss this action because APS failed to state any claim for relief under Fed. R. Civ. P. 12(b)(6). In reviewing a Rule 12(b)(6) motion, a court construes the complaint in the light most favorable to the plaintiff. *Northstar Indus. Inc. v. Merrill Lynch & Co.*, 576 F.3d 827, 832 (8th Cir. 2009) ("To survive a motion to dismiss, the factual allegations in a complaint, assumed true, must suffice 'to state a claim to relief that is plausible on its face.'" (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 554, 570 (2007))). However, "[t]he court accepts as true all factual allegations, but is 'not bound to accept as true a legal conclusion couched as a factual allegation.'" *McAdams v. McCord*, 584 F.3d 1111, 1113 (8th Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). To survive a motion to dismiss, "[t]he facts alleged in the complaint 'must be enough to raise a right to relief above the speculative level.'" *Clemons v. Crawford*, 585 F.3d 1119, 1124 (8th Cir. 2009) (quoting *Twombly*, 550 U.S. at 555).

In its Complaint, APS asserts five claims, each of which fail to establish any basis for relief. <u>*First*</u>, APS fails to plead a claim under the Administrative Procedure Act (the "APA"),

---

argument in order to give greater solicitude to an APA claim than . . . the constitutional claim."). The APA does not confer jurisdiction for federal judicial review of agency action. *See Califano v. Sanders*, 430 U.S. 99, 107 (1977); *Perez v. U.S. Bureau of Citizenship and Immigr. Servs.*, 774 F.3d 960, 965 (11th Cir. 2014) ("[T]he APA independently does not confer subject-matter jurisdiction"); *Fed. Election Comm'n v. Reform Party of U.S.*, 479 F.3d 1302, 1307 n.5 (11th Cir. 2007) ("The Declaratory Judgment Act does not, of itself, confer jurisdiction upon the federal courts"); 28 U.S.C. § 2201(a) (a federal court may provide declaratory relief to a party only "[i]n a case . . . within its jurisdiction"). Like the Medicare Act, the APA requires a "final agency action" before a claim can be subject to judicial review. *See* 5 U.S.C. § 704; *Canal A Media Holding, LLC v. U.S. Citizenship & Immigr. Servs.*, 964 F.3d 1250, 1255 (11th Cir. 2020) (an agency action is "final" under the APA if it "mark[s] the consummation of the agency's decision making process" and is an action by which "rights or obligations have been determined, or from which legal consequences will flow"). As discussed above, a payment suspension is not a "final agency action." *See* 5 U.S.C. § 704. Thus, the APA and the Declaratory Judgment Act do not provide the Court with subject matter jurisdiction to consider APS's claims.

Medicare Act, or related regulations (Count IV), let alone a claim for *ultra vires* relief (Counts III). The APA requires courts to set aside agency actions that are "arbitrary and capricious" or "in excess of statutory" authority. 5 U.S.C. § 706. Yet, APS has not pled that CMS acted beyond the authority granted to it by Congress in 42 U.S.C. § 1395y(o) or by its regulations at 42 C.F.R. Part 405, Subpart C. *See Mandan, Hidatsa & Arikara Nation v. U.S. Dep't of the Interior*, 95 F.4th 573, 581 (8th Cir. 2024) (explaining that for an agency action to be "arbitrary and capricious, the agency must have failed to rely on the relevant factors, failed to consider an important aspect of the problem, or otherwise not engaged in reasoned decisionmaking in a manner not supportable by a rational basis"); *see also Fla. v. Dep't of Health & Hum. Servs.*, 19 F.4th 1271, 1287 (11th Cir. 2021) (holding that plaintiff failed to show likelihood of success on APA claim because agency had "express statutory authority" for its actions); *see also Georgia v. Brooks-LaSure*, No. 24-cv-16, 2024 WL 3416278, at *7 (S.D. Ga. 2024) ("An agency does not act arbitrarily and capriciously by following its own regulations") (citing *Aerial Banners, Inc. v. Fed. Aviation Admin.*, 547 F.3d 1257, 1261 (11th Cir. 2008)).

In attempting to assert a claim under the APA, APS falsely contends that Defendants (1) failed to comply with a regulation requiring a response to APS's rebuttal within 15 days, *see* Compl., Doc. No. 1, ¶¶ 28, 74; (2) have taken no steps to investigate APS, *see id.* ¶¶ 18, 30-34, 75; and (3) have not taken steps to issue an overpayment determination, *see id.* ¶¶ 29, 76. These allegations fail to plead any claim for relief. CMS was not required to respond within 15 days—it merely was required to consider APS's request in that time frame, which it did, and then subsequently send written notice regarding its determination. *Compare* 42 C.F.R. § 405.375(a)-(b) (requiring CMS to "consider" the rebuttal statement within 15 days) *with* Compl., Doc. No. 1, ¶ 74 (misreading regulations regarding time to "consider"—not *respond* to—a rebuttal

statement). In fact, on August 23, 2024, CMS notified APS that it had begun considering APS's rebuttal statement—well within the 15-day window. *See* McQueen Decl., Ex. A ¶¶ 7-8. Besides, even if the 25-day response window violated a regulation (which it does not), APS does not explain how the alleged delay in response could entitle it to immediate termination of the suspension and return of the funds.

In addition, consistent with 42 C.F.R. § 405.372(a)(4), CMS notified APS that it suspended APS's Medicare payments based on "credible allegations of fraud," provided a non-exhaustive list of claims that supported the suspension and permitted APS to submit a rebuttal statement. *See* 42 C.F.R. § 405.372(b)(2); Pl.'s Mot., Ex. 1, Doc. 9-2. After "careful review" of APS's rebuttal statement and supporting documentation, CMS notified APS that the evidence provided did not justify terminating the suspension and explained its reasons for continuing the suspension. *See* 42 C.F.R. § 405.375(b)(2); Pl.'s Mot., Ex. 3, Doc. 9-4. In that written response, CMS specifically addressed each point raised by APS in the rebuttal statement, including explaining that APS's "narrative" rebuttal statement and "undated physician statements"— without supporting medical record documentation—are "insufficient to support the medical necessity of the services provided." *Id*. CMS further noted that APS failed to provide any documentation substantiating its claims regarding its "Lean Lab" arrangements with referring providers. *Id*. Thus, even though neither the Medicare Act nor regulations require CMS to notify the provider that the suspension is based on an OIG investigation, CMS alerted APS of the basis for the continuation of the suspension. *See generally* 42 C.F.R. Part 405.

As authorized by law, CMS will determine whether an overpayment was made once the investigation is completed. 42 C.F.R. § 405.372(c)(2), (e). If CMS concludes there was no overpayment, no other obligation to CMS or HHS, and no legal requirement that the funds go to

another entity, the suspended funds will be released to APS. *Id*. § 405.372(e). CMS is expressly authorized to temporarily suspend payments, as APS admits in its Complaint: "Federal regulations permit CMS to suspend Medicare payments for a number of reasons, including where 'a credible allegation of fraud exists against a provider or supplier, unless there is good cause not to suspend payments.'" Compl. ¶ 9 (citing 42 C.F.R. § 405.371(a)(2)). Thus, there is no basis for APS to assert that CMS suspended payments *ultra vires* "in lieu of an initial determination of an overpayment." *Id.* ¶ 63; *see also Key Med. Supply, Inc. v. Burwell*, 764 F.3d 955, 962–63 (8th Cir. 2014) ("[I]n order for an agency action to be *ultra vires*, there must be a plain violation of an unambiguous and mandatory provision of the statute." (citation and internal quotation marks omitted) (emphasis in original)). CMS applied the correct legal standards and acted within the authority granted to it by Congress in implementing and extending the payment suspension. As such, APS has not alleged any facts that could demonstrate a violation of the APA, Medicare Act, or any related regulation. *See* 5 U.S.C. § 706.

*Second*, APS fails to plead that the CMS payment suspension violates the due process clauses of the Fifth and Fourteenth Amendments to the United States Constitution (Count I), and therefore, APS's derivative claim seeking a declaratory judgment based on the same meritless due process allegations also must fail (Count V). As explained in Part I.B.2, *supra*, APS does not have a colorable constitutional claim based on a purported property interest in Medicare payments that have been temporarily suspended due to credible allegations of fraud. *See Clarinda*, 100 F.3d at 531 (stating there "is not a colorable constitutional violation of due process to withhold payments temporarily to a provider without a hearing"); *see also Peterson*, 508 F.2d at 50; *Reg'l Home Health Care,* 488 F. Supp. 3d at 837. APS cannot have a due process interest in suspended payments if those payments are for *false* claims, as APS is not entitled to *any*

payment for false claims. Incredibly, APS attempts to distinguish this binding case law by contending that there is no active investigation of its potentially fraudulent billing practices. Doc. No. 10, at 15. As explained in Part I.A, *supra*, APS knows full well that the United States is investigating its fraudulent Medicare billing practices.

APS's reliance on *Padda v. Becerra*, 37 F.4th 1376 (8th Cir. 2022), also is misplaced, as *Padda* did not even concern a temporary payment suspension. *See* Pl.'s Br., Doc. No. 10, at 17-19; *see also* Compl., Doc. No. 1, ¶ 14 (citing cases concerning recoupment of overpayment debts). Rather, the provider in *Padda* brought an action challenging the Medicare *recoupment* process, whereby Medicare had begun collecting an overpayment debt while the provider was still pursing related administrative remedies. *Padda*, 37 F.4th at 1379. For this reason alone, *Padda* is inapplicable to APS's action challenging a temporary payment suspension—not recoupment of an overpayment. While recoupment involves the agency collecting funds owed to it to satisfy an outstanding debt, a temporary payment suspension is just that—temporary. Besides, even if *Padda* applied, it does not advance APS's position. In *Padda*, the Eighth Circuit affirmed the district court's denial of a preliminary injunction, explaining that the provider had a "meaningful opportunity" to be heard during the first stages of the administrative process and was unlikely to succeed on a procedural due process claim. *Id.* at 1384. Critically, APS does not cite a single case stating that a provider has a due process interest in temporarily suspended funds. Nor can it in light of the binding precedent in *Clarinda* stating otherwise. *See Clarinda*, 100 F.3d at 531.

For the same reasons, APS's claim for a Declaratory Judgment (Count V) rooted in the same meritless due process allegations must fail. Compl., Doc. No. 1, ¶¶ 82-84. APS does not even present a justiciable case or controversy capable of resolution under the Declaratory

Judgment Act, which requires a case of "actual controversy" where "the declaratory remedy 'is meant to define the legal rights and obligations of the parties in anticipation of *some future conduct*, not simply to proclaim liability for a past act.'" *See Reg'l Home Health*, 488 F. Supp. 3d at 838 (quoting *Justice Network Inc. v. Craighead Cty.*, 931 F.3d 753, 764 (8th Cir. 2019)) (emphasis in original). "'Thus, declaratory relief is limited to *prospective* declaratory relief.'" *Id.* at 839 (quoting *Justice Network*, 931 F.3d at 764). APS cannot avail itself of the Declaratory Judgment Act to seek release of suspended Medicare funds.

*Third*, APS cannot show that it is entitled to the extraordinary remedy of mandamus relief (Count II). As explained in Part I.B.3, *supra*, mandamus relief is only available in the most "exceptional situations," and is not warranted here because APS cannot establish a clear and indisputable right to the relief sought, that the defendants have a nondiscretionary duty to honor that right, or that APS has no other adequate remedy. *See Castillo*, 445 F.3d at 1060-61. In fact, APS acknowledges the opposite—conceding that federal regulations permit temporary payment suspensions based on credible allegations of fraud. Compl., Doc. No. 1, ¶ 9. The Court should deny APS's efforts to evade the Congressionally-authorized administrative process and undermine an active, ongoing investigation into APS's potentially fraudulent Medicare billing practices.

## III.    APS Has Not Met Its Burden to Establish that a Preliminary Injunction Is Warranted.

Even if the Court does not dismiss, the Court should deny APS's motion for a preliminary injunction because APS cannot establish that such extraordinary relief is warranted. "A preliminary injunction is an extraordinary remedy, and the burden of establishing the propriety of the injunction is on the movant." *Turtle Island Foods, SPC v. Thompson*, 992 F.3d 694, 699 (8th Cir. 2021) (internal quotation marks omitted). In particular, a plaintiff must

establish four factors: "(1) he is likely to succeed on the merits; (2) he is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his favor; and (4) an injunction is in the public interest." *MPAY Inc. v. Erie Custom Comput. Applications, Inc.*, 970 F.3d 1010, 1015 (8th Cir. 2020) (quotation marks and citations omitted); *see also Dataphase Systems, Inc. v. CL Systems, Inc.*, 640 F.2d 109, 113 (8th Cir. 1981) (en banc).

**A.    APS Is Not Likely to Succeed on the Merits.**

In evaluating this factor of the preliminary injunction analysis, the Court should apply the "likely to prevail" standard—not the lower "fair chance of prevailing" standard. *See D.M. by Bao Xiong v. Minn. State High Sch. League*, 917 F.3d 994, 999-1000 (8th Cir. 2019). APS seeks an injunction against the enforcement of Medicare regulations that authorize CMS to temporarily suspend payments to APS based on credible allegations of fraud during the United States' ongoing investigation. As such, the higher "likely to prevail" standard applies to APS's motion for injunctive relief "against the enforcement of statutes and regulations, which are 'entitled to a higher degree of deference and should not be enjoined lightly.'" *Sleep Number Corp. v. Young*, 33 F.4th 1012, 1016-17 (8th Cir. 2022) (citation omitted).

However, regardless of which standard the Court applies, APS cannot show that it has any chance—fair or likely—of succeeding on the merits of any of its claims. As a preliminary matter, the Court lacks subject matter jurisdiction over those claims. *See Clarinda*, 100 F.3d at 531; Part I, *supra*. And even if the Court does not dismiss for lack of jurisdiction, APS has not pled any claim for relief, much less met its burden to establish that it is *likely* to prevail on the merits. *See* Part II, *supra*. Instead, without identifying any actual violation of regulation, APS simply contends that CMS did not comply with its regulations. In addition to the arguments already addressed in Part II, *supra*, APS contends that the Suspension Notice identified only five

examples of APS's potentially fraudulent conduct, without offering any basis for APS's conclusion that the five examples are insufficient to justify the suspension. *See* Pl.'s Br., Doc. No. 10, at 1, 5, 14. But CMS fully complied with its regulatory obligations, *see* Part II, *supra*, and it is under no obligation to offer additional examples when it exercises its discretion to suspend payments to a provider "in whole or in part" in cases of suspected fraud. 42 C.F.R. § 405.371(a)(2). Nor would it be logical to require CMS to identify all claims that may be impacted by fraud, given that the temporary suspension is a tool used to protect taxpayer funds while an ongoing investigation proceeds. 42 U.S.C. § 1395y(o); 42 C.F.R. §§ 405.370-405.375. Plus, the Suspension Notice expressly states that those claims are merely "sample claims" and the "list is not exhaustive or complete." Pl.'s Mot., Ex. 1, Doc. 9-2.

At bottom, APS dislikes that CMS has discretionary authority to impose a payment suspension, that CMS did not terminate the suspension following review of APS's rebuttal letter, and that the government's investigation (and the corresponding resolution of the payment suspension) is taking longer than APS would prefer. *See* Pl.'s Br., Doc. No. 10, at 15-20. But these grievances are not actionable, and they do not establish that APS can succeed on any of its claims. Thus, even if the Court applied the "fair chance" standard here, APS could not show that it has a fair chance to succeed on the merits, and a preliminary injunction is not appropriate.

**B.    APS Has Not Established Irreparable Harm.**

The Court should deny APS's motion for a preliminary injunction for the independently sufficient reason that APS has not shown irreparable harm. *See Watkins, Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003) ("Failure to show irreparable harm is an independently sufficient ground upon which to deny a preliminary injunction."). While APS points to three purported harms, none demonstrates that APS will suffer irreparable harm absent a preliminary injunction. <u>*First*</u>,

APS contends that it will suffer harm from deprivation of its constitutional rights. *See* Pl.'s Br., Doc. No. 10, at 11. But as explained in Part I.B.2, *supra*, and as held by the Eighth Circuit in *Clarinda*, APS did not suffer a due process deprivation when CMS temporarily suspended its Medicare payments based on credible allegations of fraud while the government completes its investigation. *See Clarinda*, 100 F.3d at 531.

 *Second*, APS claims that it "will almost certainly be forced out of business" if the payment suspension continues. Pl.'s Br., Doc. No. 10, at 11. However, as APS concedes, the mere possibility of economic loss is insufficient to satisfy the "irreparable harm" requirement. *Id.* (quoting *Packard Elevator v. I.C.C.*, 782 F.2d 112, 115 (8th Cir. 1986); *see also Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009) ("Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages."). Yet, APS does not offer any support for its contention that it will be forced out of business. Instead, APS asks the Court to assume irreparable harm based solely on conclusory assertions in declarations from its CEO, *see* Decl. of Kevin Hannah ¶ 7, and Director of Finance, *see* Decl. of Brandon Crain ¶ 10, that Medicare payments account for 30% to 40% of APS's revenue and that APS may not be able to hire employees and pathologists in the future to implement its strategic plan. APS does not back these claims up with any documentation or other evidence. For example, Mr. Crain concludes that "the percentage of APS revenue attributable to CMS is greater than APS's profit margin on any services," Crain Decl. ¶ 14, but does not specify (1) the amount of APS's profit margin, or (2) how those figures impact APS's cash flow, financial reserves, or financial projections. This supposition is insufficient to carry APS's burden to demonstrate irreparable harm. *See, e.g., Instant Air Freight, Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 802 (3d Cir. 1989) (reversing grant of injunction where movant'

claim that it would go out of business was "not supported by any financial statements or projections in the record indicating that [movant] will be forced into bankruptcy"); *Sprint Comm'ns. Co., L.P. v. Native Am. Telecom, LLC*, No. CIV. 10-4110, 2011 WL 2160478, at *7 (D.S.D. May 31, 2011) (denying motion where movant had "not offered sufficient concrete evidence that it faces imminent bankruptcy if the court does not grant its preliminary injunction motion"). Thus, as in *Padda*, where the Eighth Circuit found similar claims that offsets to a providers' Medicare payments (which purportedly accounted for approximately 33% of the provider's revenue) would lead a reduction in workforce to be unsupported by sufficient record evidence, *Padda*, 37 F.4th at 1382, APS's contentions are too speculative and unsupported to warrant relief.

Meanwhile, there are documented reasons to question APS's assertions about its financial solvency. Most notably, after the payment suspension went into effect, APS sold a portion of its business to a laboratory called Infinite Genomics, LLC. *See* Hannah Decl., Doc. No. 9-1, ¶ 23. While Mr. Hannah contends that APS was "forced to liquidate" these business lines in response to the payment suspension, *id.*, he fails to mention that the proceeds of the podiatry practice sale were not used to fund APS operations. Rather, APS made multiple multi-million-dollar distributions directly to APS's individual owners, and Mr. Hannah acquired a 5% ownership stake in Infinite Genomics where Mr. Hannah now serves as CEO.[7] Thus, far from being "forced to liquidate" a portion of its business to save itself from "the brink of financial ruin," Pl.'s Br., Doc. No. 10, at 11, APS appears to have sold its business to Infinite Genomics to further enrich

---

[7] The United States learned this information during sworn CID testimony from Mr. Hannah and his principal co-owners and co-managers, Donell Burkett and Hunter Pledger, approximately one week before Mr. Hannah signed the Hannah Declaration.

its individual owners and to evade the lawful temporary payment suspension of APS by billing Medicare through a different entity.

*Third*, APS claims that it will suffer irreparable harm due to "the loss of services to Medicare beneficiaries, particularly in rural areas." Pl.'s Br., Doc. No. 10, at 10. Yet, once again, APS does not provide any evidence or support for this claim. Nor can it. One scheme at issue in this case—APS's "Lean Lab" model—essentially involves a mail-order business in which gastroenterology providers nationwide prepare pathology slides in their offices and then ship them to Little Rock, Arkansas where APS reads and diagnoses those slides. If APS were to go out of business, APS offers no explanation as to why those gastroenterologists would not be able to maintain services for Medicare beneficiaries by shipping their slides to another pathology laboratory instead. Indeed, in its response to APS's rebuttal, Qlarant noted that CMS evaluated beneficiaries' access to care and "determined that there are enough pathologists and laboratories offering pathology services to Medicare beneficiaries in the area served by APS." Pl.'s Mot., Ex. 3, Doc. 9-4; *see also* McQueen Decl., Ex. A, ¶¶ 5-6. Besides, the loss of services to rural Medicare beneficiaries would be harm suffered by those beneficiaries—not by APS.

In short, APS has not established that it is entitled to a preliminary injunction because it has not met its burden to show irreparable harm.

### C.    APS Has Not Established that the Balance of the Equities or the Public Interest Warrant a Preliminary Injunction.

The balance of equities and public interest also weigh against a preliminary injunction. When the federal government opposes a preliminary injunction, the balance of equities and public interest factors merge, *Missouri v. Trump*, 128 F.4th 979, 997 (8th Cir. 2025), and "courts ask whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined," *Morehouse Enters., LLC v.*

*Bureau of Alcohol, Tobacco, Firearms and Explosives*, 78 F.4th 1011, 1016 (8th Cir. 2023) (internal quotation marks and citation omitted). In analyzing these factors, "the key question is whether the movant's likely harm without a preliminary injunction exceeds the nonmovant's likely harm with a preliminary injunction in place." *Cigna Corp. v. Bricker*, 103 F.4th 1336, 1347 (8th Cir. 2024).

Here, the United States faces significant potential harm if the Court enjoins the temporary payment suspension before the United States completes its investigation of APS's allegedly fraudulent Medicare billing practices. *First*, while the temporary CMS payment suspension is in place, CMS can protect the interests of the United States in being made whole for any past payments that APS may have received based on fraudulent conduct. If CMS were forced to prematurely release the suspended funds to APS before the fraud investigation is complete, there is a significant risk that those funds would not be available for future collection should the United States ultimately determine APS engaged in fraud. In particular, there are real concerns that APS might dissipate those funds to its owners, as evidenced by APS's recent liquidation of part of its business to pay multi-million-dollar distributions to its owners. *See* Part III.B, *supra*. *Second*, the temporary CMS payment suspension protects CMS from suffering potential additional losses from any ongoing fraud being perpetrated by APS. To date, the United States has not been able to establish whether APS has stopped the conduct at issue at its investigation. In other words, APS may be continuing to submit fraudulent claims for payment to the Medicare program. If the Court enjoins CMS from continuing the temporary payment suspension, CMS may be forced to resume paying taxpayer money to APS for fraudulent claims.

Meanwhile, as discussed in Part III.B, *supra*, APS has not articulated *any* harm that it will suffer absent an injunction. Accordingly, the balance of the equities and the public interest

30

favor leaving the temporary payment suspension in place while the government completes its investigation.

**IV.    APS Has Not Established that a Permanent Injunction Is Warranted.**

For the same reasons that APS is not entitled to a preliminary injunction, *see* Part III, *supra*, APS also is not entitled to a permanent injunction. "The standard for issuing a preliminary or permanent injunction is essentially the same, excepting one key difference. A permanent injunction requires the moving party to show actual success on the merits . . ." *Oglala Sioux Tribe v. C & W Enter., Inc.,* 542 F.3d 224, 229 (8th Cir. 2008). APS has not shown that it is likely to succeed on the merits at all—let alone "actual success on the merits." *Id.*

**V.    If the Court Enters a Preliminary Injunction, APS Should Be Required to Post Security Pursuant to Fed. R. Civ. P. 65(c).**

If the Court grants preliminary injunctive relief, defendants respectfully request that the Court order APS to post security "in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." *See* Fed. R. Civ. P. 65(c); *Rathmann Group v. Tananbaum*, 889 F.2d 787, 789 (8th Cir. 1989). If the Court orders CMS to release the suspended funds and pay APS for claims submitted going forward, and it later is determined that the injunction was improper, CMS would have no ability to recover those funds. Therefore, if the Court grants preliminary injunctive relief, defendants request that the Court require APS to post security in an amount sufficient to cover the funds currently held in suspense and any future payments to APS during the pendency of the preliminary injunction, or any other amount the Court deems sufficient.

**CONCLUSION**

Because APS has failed to meet its burden to establish subject matter jurisdiction, the Court should dismiss this action with prejudice pursuant to Fed. R. Civ. P. 12(b)(1) without

reaching APS's motion for a preliminary and permanent injunction. Moreover, because the Court lacks subject matter jurisdiction over APS's claims, the Court should not conduct a trial on the merits as suggested by APS. *See* Pl.'s Br., Doc. No. 10, at 25. Alternatively, the Court should dismiss this action with prejudice pursuant to Fed. R. Civ. P. 12(b)(6) for failure to plead a claim to relief. If the Court does consider APS's motion for a preliminary and permanent injunction, the Court should deny the motion for the reasons set forth herein. If the Court enters a preliminary injunction in favor of APS, the Court should require APS to post security pursuant to Fed. R. Civ. P. 65(c).

Respectfully submitted,

JONATHAN D. ROSS
United States Attorney
Eastern District of Arkansas

/s/    *Jamie Goss Dempsey*
_____
Jamie Goss Dempsey
Ark. Bar No. 2007239
Assistant U. S. Attorney
425 West Capitol Ave., Suite 500
Little Rock, Arkansas 72201
Tel.    (501) 340-2600
jamie.dempsey@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

This will certify that a true and correct copy of the foregoing was filed with the Court *via* CM/ECF, which shall send notification to counsel of record.

/s/    *Jamie Goss Dempsey*

_____

Jamie Goss Dempsey