### UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF ARKANSAS

| | |
|---|---|
| ADVANCED PATHOLOGY SOLUTIONS, PLLC, | : |
| | :   Case No. 4:25-cv-229-JM |
| *Plaintiff*, | : |
| v. | : |
| ROBERT F. KENNEDY, in his official capacity as Secretary of the United States Department of Health & Human Services, | : |
| and | : |
| DR. MEHMET OZ, in his official capacity as Administrator of the Centers for Medicare and Medicaid Services, | : |
| *Defendants*. | : |

## PLAINTIFF'S REPLY IN SUPPORT OF ITS MOTION FOR A PRELIMINARY AND PERMANENT INJUNCTION AND RESPONSE TO THE GOVERNMENT'S MOTION TO DISMISS

Advanced Pathology Solutions, PLLC ("APS"), in support of its Motion for a Preliminary and Permanent Injunction (ECF No. 9) and Brief (ECF No. 10, "APS Br."), hereby submits this joint response and reply to the government's Motion to Dismiss and Response to Motion for Preliminary and Permanent Injunction (ECF No. 22) and Brief (ECF No. 23, "Gov't Br.").

## INTRODUCTION

The government brazenly asserts that it may suspend APS from receiving Medicare payments *forever*, without a hearing, without providing the factual or legal basis for the suspension, and without any government enforcement action against APS—and that APS cannot challenge that suspension in any forum as long as the government *says* it is "investigating." That is wrong. "The Constitution constrains governmental action 'by whatever instruments or in

whatever modes that action may be taken.'" *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 392 (1995) (quoting *Ex parte Virginia*, 100 U.S. 339, 346–347 (1880)). And critically, the government does not contest that APS has a constitutionally protected interest in Medicare funds that have been *indefinitely* withheld. *See* Gov't Br. at 12. This case therefore boils down to whether an already year-long suspension with no end in sight constitutes an indefinite suspension. It does. As such, the Due Process Clause of the U.S. Constitution mandates that APS be given the "opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). That has not happened here. The government is currently holding APS's Medicare payments in violation of due process and its own regulations, blocking APS from initiating the administrative review process or otherwise challenging the government's unlawful conduct.

APS faces extinction because for the past year the federal government has withheld from it all Medicare payments for the services it provides based on the bare assertion that a sliver of its claims are subject to "credible allegations of fraud." Medicare payments are 40% of APS's revenue, which is well above its profit margins. As a result, APS has been sustaining tremendous losses month after month and will soon have to shutter its doors. APS comes to this Court seeking injunctive relief to ensure that APS is still operational if and when the government finally concludes its investigation.

\*          \*          \*

APS's Complaint easily withstands the government's motion to dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). The government's flagship argument is that the Court lacks subject-matter jurisdiction because APS has not yet undergone an administrative review process—a process that is *not available* because the government has strategically refused

to issue an overpayment determination. The government cannot have its cake and eat it too. Although claims arising under the Medicare Act generally need to be channeled through the agency first, there are exceptions when (1) the claims are collateral to a request for permanent relief under the Medicare Act, (2) channeling the claims through the agency would amount to a total denial of judicial review, *or* (3) the claimant has a clear right to the relief sought and no other adequate remedy. All three of these exceptions are satisfied here.

Next, the government argues that APS has failed to state a claim for every single count in the Complaint. But the government's analysis completely disregards Rule 12(b)(6) safeguards and improperly questions the veracity of APS's allegations, which must be accepted as true. APS has plausibly stated a procedural due process claim because it alleges that it has a protected property interest in Medicare payments, which the government has deprived it of without any process at all. APS has also plausibly stated a mandamus claim because it alleges that it has a clear right to an overpayment determination, the government has a nondiscretionary duty to honor that right, and APS has no other adequate remedy to pursue. Next, APS has plausibly stated a claim under the Administrative Procedure Act and for *ultra vires* agency action because it alleges that the government has withheld APS's Medicare payments for nearly a year and refused to issue an overpayment determination in violation of binding regulations and the Due Process Clause. Finally, APS has plausibly stated a claim under the Declaratory Judgment Act for a declaration that the government's continued suspension of its Medicare payments violates due process.

APS is also entitled to a preliminary and a permanent injunction ordering the government to lift the suspension of (and release) its Medicare payments and issue an overpayment determination so that it can seek administrative review. APS has already experienced irreparable harm because the government has deprived it of its property without due process of law. That

irreparable harm continues to grow. Without an injunction, APS will soon cease to exist. APS also easily meets any standard for success on the merits, including "fair chance," "likelihood of success," and "actual success."

Finally, the public interest and equities weigh heavily in APS's favor. It is contrary to the most fundamental principles of our constitutional system to allow the government "to act secretly behind closed doors," outside of the sunlight of procedural safeguards, and simply seize someone's earnings without explanation. *See Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 584 (1972) (Douglas, J., dissenting). But that is precisely what the government has done here. APS has been left in the dark, languishing under a nearly year-long suspension that will force it out of business. As APS's CEO said, "It is simply devastating for APS to be run out of business for reasons that remain unexplained by the federal government, and which APS is completely unable to challenge." Ex. 1 (Hannah Suppl. Decl. ¶ 23). Whatever interest the government and public have in combatting fraud does not justify forcing a local business to close without the owner even receiving a reasoned explanation for the decision.

For the reasons below and in APS's Brief (ECF No. 10), APS respectfully requests that the Court issue an injunction ordering the government to lift the suspension of (and to release) its Medicare payments and issue an overpayment determination so that APS can commence the administrative review process.

## ARGUMENT

### I. The Court Has Subject-Matter Jurisdiction Pursuant to the Collateral-Claim Exception Under 42 U.S.C. § 405(g), the Preclusion-of-Judicial Review Exception Under 28 U.S.C. § 1331, and the Mandamus Act, 28 U.S.C. § 1361.

The government raises a factual challenge to the Court's subject-matter jurisdiction. Gov't Br. at 8–9. When a party "raises a factual challenge" to subject-matter jurisdiction "by attacking the [jurisdictional] facts asserted," the Court may look outside the pleadings and make factual

4

findings by a preponderance of the evidence. *See Iowa League of Cities v. EPA*, 711 F.3d 844, 870 (8th Cir. 2013); *Am. Family Mut. Ins. Co. v. Vein Ctrs. for Excellence, Inc.*, 912 F.3d 1076, 1080 & n.4 (8th Cir. 2019) (explaining that in a factual challenge, "courts may look to evidence outside the pleadings and make factual findings"); *see also Davis v. Anthony*, 886 F.3d 674, 679 (8th Cir. 2018) (stating a "factual attack occurs 'when the defendant challenges the veracity of the facts underpinning subject matter jurisdiction'" and that "[i]n a factual attack, the court considers matters outside the pleadings" (citations omitted)).

As an initial matter, the government devotes most of its jurisdictional briefing to attacking arguments that APS has not raised. APS does not contest that its claims "arise under" the Medicare Act, making 42 U.S.C. § 405(g) the "sole avenue for judicial review." *Heckler v. Ringer*, 466 U.S. 602, 615 (1984). Judicial review is available under § 405(g) when a party has (1) "presented" its claims to the agency and (2) "exhausted" administrative remedies. *Mathews v. Eldridge*, 424 U.S. 319, 328 (1976). But there are exceptions to this general rule: (1) the collateral-claim exception and (2) the preclusion-of-judicial-review exception. APS clearly invoked both in its Complaint, as well as the Mandamus Act. Compl. ¶ 2. Any one of these alone is sufficient for jurisdiction, and all three are satisfied here.

### A.    Collateral-Claim Exception

Judicial review is available under § 405(g) when a party has (1) "presented" its claims to the agency and (2) "exhausted" administrative remedies. *Mathews*, 424 U.S. at 328. A party must present its claims as a necessary prerequisite to receiving a "final decision" to review under § 405(g). *See id.* ("[A] claim for benefits [must] have been presented to the Secretary. Absent such a claim there can be no "decision" of any type."); § 405(g) (stating an "individual, after any final decision . . . may obtain a review of such decision by a civil action").

Importantly, however, a party need not present constitutional claims to the agency. The Supreme Court has interpreted § 405(g) to "require[] only that there be a 'final decision' by the Secretary with respect to the *claim of entitlement to benefits*." *Mathews*, 424 U.S. at 329 (emphasis added). In *Mathews*, for example, Mr. Eldridge "failed to raise with the Secretary his constitutional claim to a pretermination hearing," yet this "fact" did not bar review because it would be "unrealistic" to expect the Secretary to adjudicate such a claim, nor would the Secretary "be required even to consider such a challenge." *Id.* at 329-30 & n.10. As another district court in this Circuit recently explained,

> While presentment of the underlying substantive claim to the agency is a nonwaivable—and, as such, "purely 'jurisdictional,'"— prerequisite for judicial review under § 405(g), a party is not required to have raised with the Secretary a constitutional claim that "[t]he Secretary would not be required even to consider." Plaintiffs' due process claim here appears to be just such a claim. Thus, Plaintiffs have satisfied § 405(g)'s presentment requirement here, as Eldridge himself had.

*Padda v. Becerra*, No. 4:21-cv-00492-SEP, 2021 WL 1906493, at *1 (E.D. Mo. May 11, 2021) (quoting *Mathews*, 424 U.S. at 329–30); *accord Reg'l Home Health Care v. Azar*, 488 F. Supp. 3d 827, 836 (S.D. Iowa 2020) ("Regional need not present its *constitutional* claim to the Secretary, only its substantive claim for benefits.").[1]

---

[1] Although APS did not need to present its constitutional claim to the agency, courts have held that "[p]resentment can be fulfilled by contesting tentative agency determinations." *Robie v. Price*, No. 2:17-cv-03089, 2017 WL 3097529, at *3 (S.D. W. Va. July 20, 2017) (noting that "[p]resentment requires an 'initial presentation of the matter to the agency'" and finding that "presentment ha[d] been satisfied" because the plaintiff "contested CMS's determination by requesting that the revocation [of his billing privileges] be rescinded"). That is exactly what APS did when it submitted a detailed rebuttal statement (with documentary evidence) contesting the payment suspension and asking that it be lifted. APS Br. at 7. So presentment is satisfied here.

The government suggests in passing that judicial review is not available until the agency has issued both an "initial determination" and a "redetermination." Gov't Br. at 11 n.3 (citing 42 U.S.C. § 1395ff(a)(3)(B)(i)). Tellingly, the government cites no caselaw in support of its position, nor

Turning to exhaustion, courts may waive the administrative exhaustion requirement when the claimant "(1) raises a colorable constitutional claim collateral to his substantive claim of entitlement; (2) shows that irreparable harm would result from exhaustion; and (3) shows that the purposes of exhaustion would not be served by requiring further administrative procedures." *Anderson v. Sullivan*, 959 F.2d 690, 693 (8th Cir. 1992). Even "clearly meritless" claims are colorable, provided they are not "so patently frivolous as to fail to confer jurisdiction." *Boock v. Shalala*, 48 F.3d 348, 353 (8th Cir. 1995) ("Although clearly meritless, these claims were probably not so patently frivolous as to fail to confer jurisdiction upon the district court."); *Padda v. Becerra*, No. 4:21-cv-00492-SEP, 2021 WL 3021426, at *2 (E.D. Mo. July 16, 2021) (holding plaintiff's claim was colorable because it was not "so patently frivolous as to fail to confer jurisdiction" (quoting *Boock*, 48 F.3d at 353)), *aff'd*, 37 F.4th 1376 (8th Cir. 2022); *see also Jensen v. Schweiker*, 709 F.2d 1227, 1230 & n.2 (8th Cir. 1983) (defining "colorable" as "not without some merit").

"To set forth a procedural due process violation, a plaintiff, first, must establish that his protected liberty or property interest is at stake. Second, the plaintiff must prove that the defendant deprived him of such an interest without due process of law." *Elder v. Gillespie*, 54 F.4th 1055, 1064 (8th Cir. 2022) (quoting *Gordon v. Hansen*, 168 F.3d 1109, 1114 (8th Cir. 1999)). In its motion for a preliminary and permanent injunction, APS argued at length (and cited extensive authority supporting) that (1) it has a protected property interest in Medicare payments that have been *indefinitely* withheld and (2) due process requires the government to provide a reasoned basis for the suspension and issue an overpayment determination in a timely manner. APS Br. at 13–19.

---

explains how this seldom-cited provision supplants the "presentment" caselaw laid out above. In any event, APS alleges that CMS suspended payments and then doubled down on that decision after APS submitted a rebuttal statement, Compl. ¶¶ 15, 28, so APS has alleged that it received both an initial determination and a redetermination.

The government does not respond to APS's arguments. Instead, the government contends that *Clarinda Home Health v. Shalala*, 100 F.3d 526 (8th Cir. 1996), controls this case. But *Clarinda* did not address the question presented here. *Clarinda* holds that it "is not a violation of due process to *temporarily* withhold Medicare payments during an ongoing investigation for acts of fraud." 100 F.3d at 531 (emphasis added). There was no contention in *Clarinda* that the claimant's funds had been *indefinitely* withheld, as opposed to temporarily withheld, so that decision plainly does not apply here.[2]

APS has never hidden the ball on this issue. It was APS that brought *Clarinda* to the Court's attention, acknowledged its holding, and distinguished it on the ground that *Clarinda* does not address the separate question of whether there is a "property interest in funds that are *indefinitely* withheld." APS Br. at 15 (collecting cases recognizing (1) the distinction between temporary and indefinite withholdings and (2) a constitutionally protected interest in the latter). Even though the indefinite nature of the suspension is at the heart of APS's due process claim, the government mentions it only once in passing: "APS posits, without support, that defendants have 'indefinitely' suspended payments to APS. This is not the case." Gov't Br. at 12. The government has come armed with nothing more than its own say-so that the suspension is not indefinite. In the lone piece of evidence attached to its motion, the declarant states only that the investigation remains ongoing. *See* ECF No. 22-1 at 2. The declarant does not provide an estimated end date, provide any detail of the investigatory tasks that remain outstanding, or even say that the suspension is *not* indefinite. Despite it being the crux of the issue, the government provides the Court with no factual basis to

---

[2] The government cites in passing two other cases. Gov't Br. at 16 (citing *Reg'l Home Health Care v. Azar*, 488 F. Supp. 3d 827 (S.D. Iowa 2020); *Peterson v. Weinberger*, 508 F.2d 45 (5th Cir. 1975)). Neither of them involved an indefinite suspension. Notably, in *Peterson*, the "district court, by preliminary injunction, ordered the withheld funds paid to Dr. Peterson." 508 F.2d at 50.

find that the investigation will be temporary as opposed to indefinite. That is both concerning and exceedingly telling.

Additionally, CMS has numerous tools at its disposal to investigate allegations of Medicare fraud, including requests for medical records and documentation; interviews with providers, beneficiaries, or other interested parties; site visits; medical reviews; and audits. *See infra* p. 34. None of these tools have been used. The conspicuous absence of evidence that CMS is using any of these investigatory tools shows that CMS is not investigating, that CMS is not working toward an overpayment determination, and that the suspension based on the "investigation" is indefinite.

The government's complete failure to respond to APS's arguments makes the "colorable" analysis easy: It is uncontested that there is a property interest in funds that have been indefinitely withheld, and numerous courts have held that this property interest exists. *See Alexandre v. Ill. Dep't of Healthcare & Fam. Servs.*, No. 20-6745, 2021 WL 4206792, at *9 (N.D. Ill. Sept. 15, 2021) ("[T]he court rules that a trier of fact could find that, in the year and a half that Dr. Alexandre's Medicaid payments have been suspended, that suspension crossed the line from 'temporary' to 'indefinite.' Hence, Dr. Alexandre has adequately alleged that she has a property interest in withheld payments for which she is owed due process of law."); *Maynard v. Bonta*, No. 02-06539, 2003 U.S. Dist. LEXIS 16201, at *57–*60 (C.D. Cal. Aug. 29, 2003) (collecting cases); *Krebsbach v. Heckler*, 617 F. Supp. 548, 551 (D. Neb. 1985) ("[T]he Secretary may temporarily suspend payments in order to conduct an investigation when confronted with reliable evidence of fraud. Such a suspension cannot continue indefinitely, but may be of a reasonable duration."). It is also uncontested that due process requires a reasoned basis for the suspension and a prompt overpayment determination, which have not been provided here. *See, e.g.*, *Barry v. Barchi*, 443 U.S. 55, 66 (1979) (holding post-suspension process "constitutionally infirm" where the person

was not "assured a prompt proceeding and prompt disposition" because "[o]nce suspension has been imposed, the [person's] interest in a speedy resolution of the controversy becomes paramount," and there is "little or no state interest . . . in an appreciable delay in going forward with a full hearing"). APS's due process claim is plainly colorable[3] and a far cry from being "so patently frivolous as to fail to confer jurisdiction." *Boock*, 48 F.3d at 353.

Next, APS's procedural due process claim is "collateral to its substantive claim of entitlement." *Anderson*, 959 F.2d at 693. "For a claim to be collateral, it must not require the court to 'immerse itself' in the substance of the underlying Medicare claim or demand a 'factual determination' as to the application of the Medicare Act." *Family Rehab., Inc. v. Azar*, 886 F.3d 496, 501 (5th Cir. 2018) (citation omitted); *accord Jensen*, 709 F.2d at 1229 ("Whether a claim is collateral to the substantive claim of entitlement depends on whether the claim is unrelated to any controverted factual question of entitlement."). Nor may the "plaintiff[] request relief that is proper under the organic statute," such as "by requesting that benefits or a provider status be *permanently* reinstated." *Family Rehab.*, 886 F.3d at 503. Plaintiffs "may bring claims that sound only in constitutional or procedural law" and "request that benefits be maintained temporarily until the agency follows the statutorily or constitutionally required procedures." *Id.* APS's due process claim is plainly collateral because it has nothing to do with APS's entitlement to Medicare payments.

The government does not address whether APS's due process claim is collateral, likely because there is a wall of authority holding that materially similar claims are collateral. *See Accident, Injury and Rehab., PC v. Azar*, 943 F.3d 195, 200 (4th Cir. 2019) ("Advantage Health challenges, under the Due Process Clause, the method by which its claims for reimbursement are

---

[3] *See also infra* Section II.A; APS Br. at 13–20.

being reviewed. Because it does not challenge the substance of HHS's decision on the merits of those claims, its claim in this case is collateral insofar as its resolution does not require us to address the substantive issue of whether Advantage Health received reimbursements for ineligible claims."); *Family Rehab.*, 886 F.3d at 504 ("Ultimately, Family Rehab seeks only the suspension of recoupment before a hearing, which is plainly collateral to the result of that hearing."). APS's due process claim involves only its procedural constitutional rights and is thus completely collateral to its entitlement to payments under the Medicare Act. APS is not asking the Court to grant it permanent relief under the Medicare Act or wade into factual issues about the alleged fraud. Instead, APS seeks (1) a ruling that the government has withheld its Medicare payments indefinitely and in violation of due process and (2) disbursal of the unlawfully withheld funds and a prompt overpayment determination so that APS can initiate the administrative review process, where it will *then* pursue its substantive claims for payment under the Medicare Act. *See Padda*, 2021 WL 1906493, at *2 ("Plaintiffs' due process claims are collateral to Plaintiffs' claims before the agency."); *Gen. Med., P.C. v. Sec'y of Health & Hum. Servs.*, 2023 WL 6164556, at *8 (E.D. Mich. Sept. 21, 2023) ("This request for procedural relief is entirely collateral to Plaintiffs' substantive claim for the permanent reinstatement of their reimbursement payments.").

Lifting the suspension will simply allow APS to continue operations until CMS concludes its investigation. It will not preclude CMS from making an overpayment determination, nor substitute the Court's judgment for CMS's as to whether APS is entitled to payment.

Turning to irreparable harm, the government overlooks the fact that APS need only show a "*colorable* claim" that exhausting administrative remedies would cause irreparable harm. *See Mathews*, 424 U.S. at 331 (emphasis added) ("Eldridge has raised at least a colorable claim that because of his physical condition and dependency upon the disability benefits, an erroneous

termination would damage him in a way not recompensable through retroactive payments."); *accord Accident, Injury and Rehab.*, 943 F.3d at 200-01 ("Advantage Health has raised at least a colorable claim that it faces irreparable harm during its wait for completion of the administrative process."); *Family Rehab.*, 886 F.3d at 504 ("Family Rehab has also 'raised at least a colorable claim' that erroneous recoupment will 'damage [it] in a way not recompensable through retroactive payments.'" (quoting *Mathews*, 424 U.S. at 331)). The government instead holds APS to a higher standard by merely cross-referencing its irreparable harm arguments related to the injunction without ever explaining why APS fails to meet the lower "colorable" standard. *See* Gov't Br. at 16–17. In any event, APS easily clears any standard for irreparable harm.

APS is on the brink of financial ruin and will almost certainly be forced out of business if it has to (1) wait for an indefinite suspension to end, (2) receive an overpayment determination, and (3) undergo a "four-part review process," Gov't Br. at 4—all before it can obtain judicial review. *See* APS Br. at 8–9; *see also infra* Section III.B.[4] What is more, APS's closure will be disruptive to Medicare patients, especially those in rural areas. APS Br. at 13; *see also infra* Section III.B. These exact "threats" were sufficient to show a colorable claim of irreparable harm in *Family Rehabilitation*. 886 F.3d at 504 ("The combined threats of going out of business and disruption to Medicare patients are sufficient for irreparable injury."). And simply the threat of going out of business was sufficient in *Accident, Injury and Rehabilitation.* In that case, the business "raised at least a colorable claim that it face[d] irreparable harm during its wait for completion of the administrative process" because the Chief Financial Officer and Executive Director stated that the business's revenue had declined, staff had been laid off, and the business would soon be forced to

---

[4] APS is able and willing to present additional evidence of the suspension's financial impact at a hearing if doing so would aid the Court in making its decision.

cease operations. 943 F.3d at 199, 200-01. So too here. *See* APS Br. at 8–9; ECF No. 9-1 (Hannah Decl.); ECF No. 9-6 (Crain Decl.); Ex. 1 (Hannah Suppl. Decl.); *see also infra* Section III.B. Prevailing in the administrative process will be cold comfort if APS has already been forced to close. *See Gen. Med.*, 2023 WL 6164556, at *8 ("[I]f Plaintiffs were to go out of business while the suspension is pending, prevailing at a later administrative hearing would provide them no benefit."). As the Fifth Circuit has explained, courts "must 'be especially sensitive' to irreparable injury 'where the Government seeks to require claimants to exhaust administrative remedies merely to enable them to receive the [rights] they should have been afforded in the first place.'" *Family Rehab.*, 886 F.3d at 504 (quoting *Bowen v. City of New York*, 476 U.S. 467, 483 (1986)).

Finally, the "purposes of exhaustion would not be served" by requiring administrative procedures. *Anderson*, 959 F.2d at 693. The collateral-claim "exception is grounded in the futility of making a constitutional challenge before an agency," *Jensen*, 709 F.2d at 1229, and animated by the "core principle that statutorily created finality requirements should, if possible, be construed so as not to cause crucial collateral claims to be lost and potentially irreparable injuries to be suffered," *Mathews*, 424 U.S. at 321 n.11. Raising a procedural due process claim before the agency would be futile because it is "unrealistic" to expect the Secretary to adjudicate such a claim, nor would the Secretary "be required even to consider such a challenge," *id.* at 329–30, 330 n.10, so the purposes of exhaustion would not be served by requiring APS to undergo the four-part administrative review process. *See Padda*, 2021 WL 1906493, at *3.

These principles apply with full force to APS's *ultra vires*, Administrative Procedure Act, and Declaratory Judgment Act claims. None of these are substantive claims for payment under the Medicare Act that would need to be presented to an agency, *see supra* p. 6 & n.1, and they are collateral because they are "unrelated to any controverted factual question of entitlement," *Jensen*,

709 F.2d at 1229, "sound only in constitutional or procedural law," and "request that benefits be maintained temporarily until the agency follows the statutorily or constitutionally required procedures," *Family Rehab.*, 886 F.3d at 503. All of these claims are premised on the government's failure to follow constitutionally and statutorily required procedures, which makes them "ideally suited" for the collateral-claim exception. *See Blossom South, LLC v. Sebelius*, 987 F. Supp. 2d 289, 297 (W.D.N.Y. 2013) (holding that there is "subject matter jurisdiction over plaintiff's claims" under the collateral-claim exception where plaintiff sought "declaratory relief, to the effect that defendants have violated plaintiff's due process rights, its rights under the Medicare Act, and the APA, as well as temporary injunctive relief" and reaching the merits of all claims); *Family Rehab.*, 886 F.3d at 503 ("Family Rehab's procedural due-process and *ultra vires* claims are plainly collateral. . . . Family Rehab's procedural due-process and *ultra vires* claims will not require the court to wade into the Medicare Act or regulations; those claims only require the court to determine how much process is required under the Constitution and federal law before recoupment."); *Supreme Home Health Servs. v. Azar*, 812 F. App'x 229, 233 (5th Cir. 2020) ("[T]he collateral-claims exception allows courts to entertain not-yet-exhausted procedural due process and *ultra vires* claims when (1) the claims are entirely collateral to a substantive agency decision and (2) the party assuming the claims cannot obtain full relief at a post-deprivation hearing." (cleaned up)); *Sahara Health Care, Inc. v. Azar*, 349 F. Supp. 3d 555, 564 (S.D. Tex. 2018) ("Plaintiff's procedural due process and *ultra vires* claims are collateral.").

APS's *ultra vires*, Administrative Procedure Act, and Declaratory Judgment Act claims are also colorable. *See infra* Section II.C–E; APS Br. at 22–24. For the same reasons as its due process claim, APS would be irreparably harmed if it first had to exhaust administrative remedies before bringing these claims, *see supra* p. 12, and the purposes of exhaustion would not be served by

requiring administrative procedures, *see supra* p. 13. APS's due process, *ultra vires*,[5] Administrative Procedure Act,[6] and Declaratory Judgment Act claims fall squarely within the collateral-claim exception, so the Court "has jurisdiction." *Family Rehab.*, 886 F.3d at 504.

### B.    Preclusion-of-Judicial-Review Exception

APS's due process, *ultra vires*, Administrative Procedure Act, and Declaratory Judgment Act claims satisfy another exception to § 405(g). A court has jurisdiction under 28 U.S.C. § 1331 when applying § 405(g) "would not simply channel review through the agency, but would mean no review at all." *Shalala v. Ill. Council on Long Term Care, Inc.*, 529 U.S. 1, 19 (2000) (construing *Bowen v. Mich. Acad. of Family Physicians*, 476 U.S. 667 (1986)). Without an injunction, APS will experience a "*complete* preclusion of judicial review." *Id.* at 23. APS will not exist long enough to see the indefinite suspension lifted, receive an overpayment determination, and undergo a four-part administrative review process that eventually culminates in judicial review. This is the unusual case where denying APS the limited injunctive relief it seeks would "amount to the 'practical equivalent of a total denial of judicial review.'" *Pathfinder Healthcare, Inc. v. Thompson*, 177 F. Supp. 2d 895, 896–97 (E.D. Ark. 2001) (Moody, J.) (quoting *Ill. Council*, 529 U.S. at 20). Absent injunctive relief, APS will be "forced to close down before its

---

[5] Although the government suggests that there is no life left in the *ultra vires* doctrine, *see* Gov't Br. at 18 n.6, that is belied by the caselaw. The Eighth Circuit has stated that "an *ultra vires* action may be reviewed even in the face of statutory bar on review" and that an agency action is *ultra vires* when there is a "plain violation of an unambiguous and mandatory provision of the statute." *Key Med. Supply, Inc. v. Burwell*, 764 F.3d 955, 962 (8th Cir. 2014) (citation omitted).

[6] To the extent that the government suggests that APS is wielding the Administrative Procedure Act ("APA") as some sort of free-wheeling jurisdictional hook, *see* Gov't Br. at 18 n.6, that could not be further from the truth. It is hornbook law that the "APA is not an independent jurisdictional provision." *Ochoa v. Holder*, 604 F.3d 546, 549 (8th Cir. 2010). It is obvious that APS is not using the APA as an independent jurisdictional hook, as it argues at length that the Court has jurisdiction to review its APA claim through the jurisdictional vehicles discussed in Section I.A–B.

administrative remedies ha[ve] been exhausted" and "would not be in a position to seek judicial review at the close of the administrative process." *Frontier Health Inc. v. Shalala*, 113 F. Supp. 2d 1192, 1193 (E.D. Tenn. 2000).

### C.    Mandamus Act

"[M]andamus jurisdiction" lies (and a writ of mandamus should issue)[7] when the plaintiff "establish[es] (1) 'a clear and indisputable right to the relief sought,' (2) the [federal] officer 'has a nondiscretionary duty to honor that right,' and (3) there is 'no other adequate remedy.'" *Mitchael v. Colvin*, 809 F.3d 1050, 1054 (8th Cir. 2016) (quoting *Castillo v. Ridge*, 445 F.3d 1057, 1060–61 (8th Cir. 2006)). "[W]hether a writ of mandamus should issue is largely a matter within the district court's discretion." *Castillo*, 445 F.3d at 1061.

APS has a clear and indisputable right to an overpayment determination. The Secretary of Health and Human Services has promulgated a binding regulatory framework governing the suspension of payment. *See* 42 C.F.R. §§ 405.370–75 (suspension of payment framework); 42 C.F.R. § 405.1063(a) ("All laws and regulations pertaining to the Medicare and Medicaid programs . . . are binding on ALJs and attorney adjudicators, and the [Medicare Appeals] Council."). That framework culminates in the issuance of an overpayment determination, which is the key to unlocking a provider's appeal rights. Because binding regulations require CMS "to make a determination as to whether an overpayment exists," 42 C.F.R. § 405.372(c)(2), and provide that "all suspensions of payment . . . will be temporary," 42 C.F.R. § 405.372(d)(3)(ii), APS has a clear right to receive an overpayment determination. *See Gen. Med., P.C. v. Sec'y of U.S. Dep't of*

---

[7] "[M]andamus jurisdiction under [28 U.S.C.] § 1361 merges with the merits." *Lovitky v. Trump*, 949 F.3d 753, 751 (D.C. Cir. 2020); *accord Maczko v. Joyce*, 814 F.2d 308, 310 (6th Cir. 1987) ("The existence of jurisdiction under section 1361 is inextricably bound with the merits of whether a writ of mandamus should issue[.]").

*Health & Human Servs.*, No. 22-cv-11976, 2023 WL 6164556, at *10 (E.D. Mich. Sept. 21, 2023) ("Plaintiffs sufficiently allege that the Secretary owes them a non-discretionary duty to issue an Overpayment Determination and to thereby make the administrative review process available to them."); *VCP Home Health Care Agency, Inc. v. Sebelius*, No. 3:10-cv-1152, 2011 WL 13290666, at *5 (N.D. Tex. Feb. 10, 2011) ("[Plaintiff] has a clear right to an overpayment determination.").

In what has now become a common theme, the government does not respond to any of APS's authority. Instead, the government cites one non-binding case with facts that are a far cry from those here. Gov't Br. 17–18 (citing *Naushad v. United States Dep't of Health & Hum. Servs.*, No. 4:20-CV-00018, 2020 WL 2800381 (E.D. Mo. May 29, 2020)). In *Naushad*, the petitioner had a pending federal criminal case against him, which gave rise to the payment suspension. 2020 WL 2800381, at *1. Part and parcel of the district court's holding that the petitioner did not have a clear and indisputable right to the relief sought was the notion that CMS was not obligated to make a final determination during the "pendency of a civil or criminal action." *Id.* at *4.

Here, the government has not asserted any claims against APS, and thus there is no excuse for its delay. APS is at exactly the same juncture as the petitioner in *VCP Home Health*, who was also at the post-rebuttal stage, and this Court should similarly find that APS has a clear right to an overpayment determination. *See VCP Home Health*, 2011 WL 13290666, at *5.

Like two sides of the same coin, the government also has a nondiscretionary duty to issue an overpayment determination. The government "must" make an overpayment determination, 42 C.F.R. § 405.372(c)(2), and "must" means that it is mandatory. *See Johnson v. Wireman*, 809 F. App'x 97, 100 (3d Cir. 2020) ("'Must,' of course, indicates something mandatory."); *SAS Inst., Inc. v. Iancu*, 584 U.S. 357, 362–63 (2018); *FTC v. Tarriff*, 584 F.3d 1088, 1091 (D.C. Cir. 2009);

*cf. Mitchael*, 809 F.3d at 1054 (stating that "may" is "permissive" and thus "does not provide the necessary clear and non-discretionary duty for exercise of mandamus jurisdiction").

The government, for its part, conflates the discretion to suspend payments with the mandate to issue an overpayment determination. *Compare* 42 C.F.R. § 405.371 ("may" suspend payments), *with* 42 C.F.R. § 405.372(c)(2)(i) ("must" make an overpayment determination). Binding regulations provide that the government "*may*" suspend payments, 42 C.F.R. § 405.371 (emphasis added), but if it does so, "subsequent action *must* be taken . . . to make a determination as to whether an overpayment exists," 42 C.F.R. § 405.372(c)(2)(i) (emphasis added). CMS's own manual goes even further: "The UPIC *shall* make *all reasonable efforts* to expedite the determination of the overpayment amount." MEDICARE PROGRAM INTEGRITY MANUAL § 8.3.2.3.1, https://www.cms.gov/regulations-and-guidance/guidance/manuals/downloads/pim83c08.pdf (emphasis added). The government completely fails to address the post-suspension *mandate* that CMS make a determination. *See* Gov't Br. at 18. That is likely because CMS has not taken any "subsequent action . . to make a determination as to whether an overpayment exists." 42 C.F.R. § 405.372(c)(2)(i). Indeed, the only investigation the government references is in connection with ██████████████████████████████████████████████████████ ████████████████████████ *See infra* p. 35.

Lastly, APS has no other adequate remedy. Without an overpayment determination in hand, it cannot exercise its appeal rights. *See* 42 U.S.C. § 1395ff(b); 42 C.F.R. § 405.904. The government argues that APS has other remedies through the four-part administrative review process and must pursue them. *See* Gov't Br. at 18. But how? For APS to take the first step in that process, the government must make an overpayment determination. It has not done so, leaving APS without the key to unlock the doors to administrative review. Even the government's own

caselaw states that "[the petitioner] did not have the right to appeal [the CMS contractor's] interim decision to continue the suspension" absent an overpayment determination. *See MedPro Health Providers, LLC v. Hargan*, No. 17-C-1568, 2017 WL 4699239, at *5 (N.D. Ill. Oct. 19, 2017). The government's indefinite suspension has left APS with no other adequate remedy through the administrative review process or otherwise.

In sum, APS has met the requirements for mandamus jurisdiction and relief. The Court has jurisdiction to order such relief and should do so here.

## II.    APS Has Stated a Plausible Claim for Relief as to Every Count in the Complaint.

The Court should deny the government's motion to dismiss the Complaint (ECF No. 1) under Rule 12(b)(6) because APS has plausibly alleged each of its claims. A plaintiff must "allege facts that, accepted as true, state a claim to relief that is plausible on its face." *Pietoso, Inc. v. Republic Servs.*, 4 F.4th 620, 622 (8th Cir. 2021). In evaluating a motion to dismiss under Rule 12(b)(6), the Court "accept[s] the facts alleged in the complaint as true and draw[s] all reasonable inferences in favor" of the plaintiff. *Id.* Dismissal is proper only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Par. v. Wolfe Clinic, P.C.*, 70 F.4th 441, 446 (8th Cir. 2023) (citation omitted).

### A.    Procedural Due Process

To state a procedural due process claim, a plaintiff must allege that (1) a "protected liberty or property interest is at stake" and (2) the "defendant deprived him of such an interest without due process of law." *Elder v. Gillespie*, 54 F.4th 1055, 1064 (8th Cir. 2022) (quoting *Gordon v. Hansen*, 168 F.3d 1109, 1114 (8th Cir. 1999)).

APS plausibly alleges that it has a constitutionally protected property interest in getting reimbursed for the services it has performed. Compl. ¶¶ 41–42. A plaintiff has a protected property interest in something when he or she has a "legitimate claim of entitlement" to it. *Bd. of Regents*

*of State Colls. v. Roth*, 408 U.S. 564, 577 (1972). Property interests are not created by the U.S. Constitution but are derived instead from an independent source, such as "federal law." *Educ. Assistance Corp. v. Cavazos*, 902 F.2d 617, 627 (8th Cir. 1990). Federal law gives providers a right to be paid for the services they provide, subject to a few statutory qualifications. *See* 42 U.S.C. § 1395g(a) (stating, as relevant, that "the provider of services shall be paid"). Because federal law entitles APS to payment for the services it provides, APS has a constitutionally protected interest in those funds. *See, e.g.*, *Arthritis & Osteoporosis Clinic of E. Tex., P.A. v. Azar*, 450 F. Supp. 3d 740, 749 (E.D. Tex. 2020) ("[A provider] has a valid property interest in receiving Medicare payments for services rendered." (quoting *Angels of Care Home Health, Inc. v. Azar*, No. 18-cv-3268, 2019 WL 1101286, at *2 (N.D. Tex. Feb. 13, 2019))); *Med-Cert Home Care, LLC v. Azar*, 365 F. Supp. 3d 742, 751 (N.D. Tex. 2019) ("Precedent makes clear that Med-Cert has a valid property interest in receiving Medicare payments for services rendered."); *Adams EMS, Inc. v. Azar*, No. H-18-1443, 2018 WL 5264244, at *10 (S.D. Tex. Oct. 23, 2018) (same); *Morrison v. Sebelius*, No. 2:11-cv-1002, 2013 WL 3288167, at * 4 (S.D. Ohio June 28, 2013) (same); *Family Rehab., Inc. v. Azar*, No. 17-cv-2018, 2018 WL 3155911, at *4 (N.D. Tex. June 28, 2018) (same). The right is so well-established that in a recent case before the Eighth Circuit, the government did not even challenge the provider's assertion that he had a property interest in the Medicare payments he earned. *See Padda v. Becerra*, 37 F.4th 1376, 1382 (8th Cir. 2022) ("Medicare does not challenge the assertion that Dr. Padda has a property interest in Medicare payments he has earned, so we will proceed to the issue of whether Dr. Padda received sufficient process.").

To be sure, it may be true that there is no constitutionally protected interest in funds that are *temporarily* withheld during an *active* CMS fraud investigation. *See, e.g.*, *Clarinda*, 100 F.3d at 531 ("[I]t is not a violation of due process to *temporarily* withhold Medicare payments during

an ongoing investigation for acts of fraud." (emphasis added)). But that is not what is alleged here. APS alleges that the government has *indefinitely* suspended payment of APS's funds for almost a year and has not yet taken even the most basic investigatory steps. Compl. ¶¶ 30-35, 47, 83-84. Numerous federal courts have held that while there may be no property interest in funds that are *temporarily* withheld, there is a property interest in funds that are *indefinitely* withheld. *See Alexandre v. Ill. Dep't of Healthcare & Fam. Servs.*, No. 20-6745, 2021 WL 4206792, at *7–*8 (N.D. Ill. Sept. 15, 2021); *Maynard v. Bonta*, No. 02-06539, 2003 U.S. Dist. LEXIS 16201, at *57–*60 (C.D. Cal. Aug. 29, 2003) (collecting cases); *Krebsbach v. Heckler*, 617 F. Supp. 548, 551 (D. Neb. 1985). Similarly, although federal regulations allow CMS to suspend payment based on credible allegations of fraud, the same regulations guarantee that any suspension "will be temporary." 42 C.F.R. § 405.372(d)(3)(ii).

Whether the suspension has crossed the line from temporary to indefinite is a question of fact that cannot be resolved at the Rule 12(b)(6) stage. APS's well-pleaded allegations that the government has indefinitely suspended its Medicare payments and that the government has not taken even the most basic investigatory steps must be "accepted as true." *See Pietoso, Inc.*, 4 F.4th at 622; *see also Alexandre*, 2021 WL 4206792, at *9 (ruling that a "trier of fact could find that, in the year and a half that [plaintiff]'s Medicaid payments have been suspended, that suspension crossed the line from 'temporary' to 'indefinite.' Hence, [plaintiff] has adequately alleged that she has a property interest in withheld payments for which she is owed due process of law.").

APS has also plausibly alleged that the government "deprived it of [its property] interest without due process of law." *Elder*, 54 F.4th at 1064. APS alleges that the government "suspended [its] Medicare reimbursements indefinitely without providing any pre- or post-deprivation process

to challenge the actual basis of the suspension" and failed to provide any specific findings on or an explanation about the suspension. Compl. ¶¶ 47–51.

To determine if the process provided is sufficient, courts balance (1) the "private interest that will be affected by the official action"; (2) the "Government's interest"; and (3) the "risk of an erroneous deprivation of [the private] interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards." *Mickelson v. Cnty. of Ramsey*, 823 F.3d 918, 924 (8th Cir. 2016) (quoting *Wallin v. Minnesota Dep't of Corr.*, 153 F.3d 681, 690 (8th Cir. 1998)).

APS's interest in receiving Medicare payments for the services it has provided far outweighs the government's comparatively minimal interest in withholding *all* of those funds based on a *sliver* of claims that allegedly are fraudulent—particularly where the government has given no explanation for *why* it believes those claims are fraudulent, let alone offered *evidence* to support that belief. ██████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████

Medicare payments amount to approximately 40% of APS's revenue, and without that income, it will be forced out of business. At the end of the day, the "government gets its due sooner or later (with interest)" because APS would have to pay back any funds that it obtained by fraud. *See Sahara Health Care, Inc. v. Azar*, 975 F.3d 523, 530 (5th Cir. 2020). APS, by contrast, may not survive long enough to see the investigation conclude and the suspension lifted. The release of

APS's funds at the conclusion of the investigation "will be cold comfort if [APS] has already closed its doors." *Id.*

On similar facts, the Eighth Circuit held that a doctor who challenged the recoupment of Medicare payments had a "significant interest" in his income that outweighed the government's "relatively slight" interest in "protecting public resources and preventing fraud." *Padda v. Becerra*, 37 F.4th 1376, 1382 (8th Cir. 2022). Dr. Padda said that Medicare payments made up about "33% of his practice's total monthly revenue" and that "[l]oss of this income . . . would force him to significantly reduce his workforce and the number of patients he treats, and may cause him to close his business." *Id.* Although "Medicare has an interest in protecting public resources and preventing fraud," the Eighth Circuit recognized that "these interests are not as urgent as Dr. Padda's interest" because there is no evidence that "any delay in recovery against Dr. Padda will cause long-term harm to Medicare or prevent Medicare from providing services to other beneficiaries." *Id.*; *accord Sahara Health Care, Inc.*, 975 F.3d at 530 (concluding the "private interest outweighs government interest" where "full recoupment would cause the company to close" and "the government [would] get[] its due sooner or later (with interest)"). So too here.

Next, the court considers the "likelihood of an erroneous deprivation of the private interest involved as a consequence of the procedures used." *Padda*, 37 F.4th at 1383 (quoting *Mickelson*, 823 F.3d at 926). This inquiry looks to "whether the administrative procedures [APS] has already received, or those [it] chose to forgo, adequately protect [its] property interest." *Id.* "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews*, 424 U.S. at 333 (quoting *Armstrong*, 380 U.S. at 552). In this case, APS alleges that it has received no process and cannot receive any further process until the government issues an overpayment determination. Compl. ¶¶ 47–51.

A provider may challenge the suspension of payments by submitting a rebuttal statement, and federal regulations require a written response within 15 days that "contain[s] specific findings on the conditions upon which the suspension is initiated, continued, or removed and an explanatory statement of the determination." 42 C.F.R. § 405.375(b)(2). APS submitted a rebuttal statement and detailed documentary evidence, explaining why the services provided in connection with the five claims were medically necessary. Compl. ¶ 21. Not only did the government's contractor respond late (25 days after receiving APS's rebuttal statement), but more importantly, its response contained no specific findings or explanatory statement why the suspension remains in effect. Compl. ¶¶ 27–28.

The Supreme Court "usually has held that the Constitution requires some kind of a hearing *before* the [government] deprives a person of liberty or property." *Zinermon v. Burch*, 494 U.S. 113, 127–28 (1990) (collecting cases). To date, APS has received no process other than a "vague" response to its rebuttal statement, Compl. ¶ 28, and the government has failed to satisfy the procedural safeguards that exist to protect providers from an erroneous deprivation. This stands in sharp contrast to the process that the Eighth Circuit held sufficient in *Padda*. There, the Eighth Circuit ultimately rejected Dr. Padda's due process claim because he had received a "meaningful opportunity to be heard at the first two stages of administrative review," which (1) occurred *before* the government began recouping overpayments and (2) included representation by counsel, submission of written arguments, and "written, reasoned decisions." *Padda*, 37 F.4th at 1383. In this case, the government's actions have completely prevented APS from starting the administrative review process. The government has indefinitely suspended APS's Medicare payments without providing APS any evidence supporting the suspension or giving anything more than vague and conclusory assertions about why the suspension exists in the first place.

24

Due process requires an opportunity to be heard at a meaningful time and in a meaningful manner, which means that APS should receive a reasoned basis for the suspension and a prompt overpayment determination so that it can commence the appeal process. *See, e.g.*, *Barry*, 443 U.S. at 66 (holding post-suspension process "constitutionally infirm" where the person was not "assured a prompt proceeding and prompt disposition" because "[o]nce suspension has been imposed, the [person's] interest in a speedy resolution of the controversy becomes paramount," and there is "little or no state interest . . . in an appreciable delay in going forward with a full hearing"); *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) ("[I]n *Arnett* six Justices found constitutional minima satisfied where the employee had access to the material upon which the charge was based and could respond orally and in writing and present rebuttal affidavits."). Neither has been provided to APS, and it has therefore adequately alleged that it has been deprived of the Medicare payments it has earned without due process of law.

### B.    Writ of Mandamus

Whether there is mandamus jurisdiction and the merits of whether a writ of mandamus should issue are the same inquiry. *See Lovitky v. Trump*, 949 F.3d 753, 751 (D.C. Cir. 2020) ("[M]andamus jurisdiction under § 1361 merges with the merits."); *accord Maczko v. Joyce*, 814 F.2d 308, 310 (6th Cir. 1987) ("The existence of jurisdiction under section 1361 is inextricably bound with the merits of whether a writ of mandamus should issue[.]"). Because the Court has mandamus jurisdiction, *see supra* Section I.C, APS has also stated a claim for mandamus relief. *See* Compl. ¶¶ 54–60 ("Defendants have violated their non-discretionary, statutory obligation to end the payment suspension and issue an overpayment notice so Plaintiff may commence the administrative appeals process. Plaintiff has not failed to exhaust any available administrative remedies as there is nothing Plaintiff can do until it receives the overpayment notice[.]").

### C.    *Ultra Vires* Agency Action

APS plausibly alleges that the government has taken *ultra vires* agency action. An agency action is *ultra vires* when it amounts to a "plain violation of an unambiguous and mandatory provision of the statute." *Key Med Supply, Inc. v. Burwell*, 764 F.3d 955, 962 (8th Cir. 2014) (quoting *Neb. State Legis. Bd. v. Slater*, 245 F.3d 656, 659 (8th Cir. 2001)); *Staege v. U.S. Parole Comm'n*, 671 F.2d 266, 268 (8th Cir. 1982) (stating that a "federal agency[] is obliged to obey its own regulations"); *Voyageurs Region Nat'l Park Ass'n v. Lujan*, 966 F.2d 424, 428 (8th Cir. 1992) ("An agency must indeed follow its own regulations while they remain in force.").

As explained above, the government is required to make an overpayment determination, *see supra* pp. 16–17, and regulations require suspensions to be "temporary." 42 C.F.R. § 405.372(d)(3)(ii). APS plausibly alleges plain violations of both requirements because the government has not issued an overpayment determination and a year-long suspension with no end in sight is not temporary—it is indefinite. Compl. ¶¶ 35, 83–84. In issuing a decision on a rebuttal statement, the government is required to send within 15 days a written notice that "contain[s] specific findings . . . and an explanatory statement of the determination." 42 C.F.R. §§ 405.372(c)(2), 405.375(b)(2). These requirements are clear and use mandatory language (*i.e.*, "must"). *See SAS Inst., Inc.*, 584 U.S. at 362–63; *Johnson*, 809 F. App'x at 100; *Tarriff*, 584 F.3d at 1091. APS alleges that the government's late response "contained no specific findings of any kind"; "faulted APS for failing to provide documents that were never identified or requested, or that would have provided any materially different information than what APS had already provided"; and "avoided addressing the merits" of APS's rebuttal statement. Compl. ¶ 28. Because APS plausibly alleges that the government has failed to comply with these unambiguous and mandatory regulations, APS has stated an *ultra vires* claim.

The government ventures outside the four corners of the Complaint and misconstrues its regulatory obligations. The government asserts that its response at ECF No. 9-4 complied with its regulatory obligations because "CMS specifically addressed each point raised by APS in the rebuttal statement" and "explained its reasons for continuing the suspension." Gov't Br. at 21. But CMS was obligated to make "specific *findings*," § 405.375(b)(2) (emphasis added), not "specifically address[]" each point, Gov't Br. at 21. Even a cursory look at ECF No. 9-4 shows that the government did not make any specific findings or explain why the suspension remains in effect: the first two pages summarize APS's rebuttal, the third page is largely dedicated to explaining (incorrectly) that the suspension will not impact beneficiaries' access to services and noting the financial impact of the suspension, the "Basis for the Payment Suspension" section on the bottom of page three to the top of the final page simply asserts (incorrectly) that "regulations do not require CMS to provide additional details," and the final section merely says that the documentation attached to APS's rebuttal statement is insufficient. ECF No. 9-4. There are no specific findings, nor is there a reasoned explanation of the determination, which plainly violates binding regulations.

The government also contends that it "was not required to respond within 15 days—it merely was required to consider APS's request in that time frame." Gov't Br. 20. Yet again, the government cherry-picks a few words from the regulation without reconciling its position with the rest of the text. Section 405.375(a) states:

> If the provider or supplier submits a [rebuttal] statement . . . [as to] why a suspension should be terminated, CMS, the intermediary, or carrier **must within 15 days**, from the date the statement is received, **consider the statement** (including any pertinent evidence submitted), together with any other material bearing upon the case, **and determine whether the facts justify the suspension**, offset, or recoupment or, if already initiated, justify the termination of the suspension, offset, or recoupment.

§ 405.375(a) (emphasis added). The regulation could not be clearer that the government had to both (1) consider APS's rebuttal statement and (2) determine whether the facts justify the suspension within the 15-day window. The government's declaration states only that it began considering APS's rebuttal within the 15-day window—not that it determined that the facts justify a suspension within the 15-day window. ECF No. 22-1 ¶ 8. Even venturing outside the Complaint, the government's evidence shows that it did not comply with governing regulations.

### D. Unlawful Agency Action Under the Administrative Procedure Act

APS also plausibly alleges that the government took agency action that is prohibited by the Administrative Procedure Act ("APA"). Compl. ¶¶64–81. The APA authorizes federal courts to "hold unlawful and set aside agency action" that is, among other things, "contrary to constitutional right, power, privilege, or immunity"; "without observance of procedure required by law"; or "not in accordance with law." 5 U.S.C. § 706(2). This Court also has the authority under the APA to "strike down as ultra vires" agency action that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." *Iowa League of Cities*, 711 F.3d at 876.

As explained above, APS plausibly alleges that the government violated the Due Process Clause by imposing an indefinite suspension of APS's Medicare payments without providing APS due process of law. *See supra* Section II.A. Nearly a year has passed, and the government has not provided a sufficient explanation for the suspension, including why it remains ongoing or when it will end. *See supra* pp. 26–27; Compl. ¶¶ 35, 43, 47, 64, 68. APS also plausibly alleges that the government has violated binding federal regulations by failing to (1) determine whether the facts justify a suspension and issue that determination within 15 days; (2) send a notice "contain[ing] specific findings on the conditions upon which the suspension is initiated, continued, or removed and an explanatory statement of the determination," 42 C.F.R. § 405.375(b)(2); and (3) issue an

overpayment determination, 42 C.F.R. § 405.372(c)(2). *See supra* pp. 16–18, 26–28; Compl. ¶¶ 28–29, 73–78. As such, APS has plausibly alleged that the continued suspension of APS's Medicare payments is unlawful and contrary to the procedures required by law.[8] In addition to the power to set aside the suspension, this Court also has the power to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). For relief under § 706(1), a plaintiff must "assert[] that an agency failed to take a *discrete* agency action that it is *required to take*." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004). This test "precludes . . . broad programmatic attack[s]" and attacks against "action that is not demanded by law (which includes, of course, agency regulations that have the force of law)." *Id.* at 64–65.

The Eighth Circuit has treated the test for mandamus relief and § 706(1) relief as essentially the same. *See Org. for Competitive Markets v. U.S. Dep't of Agric.*, 912 F.3d 455, 462 (8th Cir. 2018) (stating that the outcome is the same regardless of "whether petitioners' claim is reviewed under § 706(1) or as a petition for a writ of mandamus" and observing that "§ 706(1) authorizes courts to 'carr[y] forward the traditional practice prior to its passage, when judicial review was achieved through use of the so-called prerogative writs—principally writs of mandamus under the All Writs Act.'" (quoting *Norton*, 542 U.S. at 63)); *see also Agua Caliente of Cupeno Indians v. Sweeney*, 932 F.3d 1207, 1216 (9th Cir. 2019) (considering the "Mandamus Act, 28 U.S.C. § 1361, and a similar provision of the APA, 5 U.S.C. § 706(1)," together "[b]ecause the relief sought is essentially the same") (citation omitted); *In re La. Pub. Serv. Comm'n*, 58 F.4th 191, 193 (5th Cir.

---

[8] ████████████████████████████████████████████████

2023) ("We interpret the All Writs Act and the APA to provide separate, but closely intertwined, grounds for mandamus relief.").

For the reasons explained above, *see supra* pp. 16–18, binding regulations require the government "to make a determination as to whether an overpayment exists." 42 C.F.R. § 405.372(c)(2). Because making an overpayment determination is a discrete agency act demanded by binding regulations, and withholding that determination violates those regulations and APS's due process rights, APS has plausibly alleged that the Court has the power to compel the government to make an overpayment determination under the APA.

### E.    Declaratory Judgment Act

APS seeks a declaration under the Declaratory Judgment Act that the government's "indefinite suspension of Medicare payments for services rendered" violates due process. Compl. ¶¶ 83–84 (Count V). The government argues that APS has failed to state a claim because APS's requested declaration is based on a "meritless" due process claim, and "APS cannot avail itself of the Declaratory Judgment Act to seek release of suspended Medicare funds." Gov't Br. at 23-24.

For starters, APS is not using the "Declaratory Judgment Act to seek release of suspended Medicare funds." Count V of the Complaint is plainly limited to a request for a declaration. Compl. ¶¶ 83–84. Next, APS's due process claim is far from meritless for the reasons above, *see supra* Section II.A, so there is no reason to dismiss APS's request for declaratory relief on that ground.

APS has stated a claim for relief under the Declaratory Judgment Act. The Act provides that a federal court, "[i]n a case of actual controversy within its jurisdiction . . . may declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a). For declaratory relief, "[t]here must be a concrete dispute between parties having adverse legal interests, and the declaratory judgment plaintiff must seek 'specific relief through a

decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.'" *Maytag Corp. v. Int'l Union, Un. Auto., Aerospace & Agric. Implement Workers of Am.*, 687 F.3d 1076, 1081 (8th Cir. 2012) (quoting *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 241 (1937)). Despite the government's insistence to the contrary, APS is not asking the Court to proclaim that a previous act was unlawful, *see* Gov't Br. at 24—the unlawful indefinite suspension remains ongoing, and there is no end in sight. APS is languishing under an unlawful suspension that will almost certainly continue for quite some time because the government has given no indication that the investigation is nearing completion. Thus, the "facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Maytag Corp.*, 687 F.3d at 1081 (quoting *Md. Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941)).

What is more, the government's own authority dooms its position. The government wields *Regional Home Health Care* for the proposition that a party may not seek a declaration proclaiming liability for a past act, *see* Gov't Br. at 24, but *Regional Home Health Care* expressly says that the requirements for declaratory relief would have been satisfied in that case if the "temporary suspension was [still] in effect." 488 F. Supp. 3d at 839 ("Regional's request for declaratory judgment might have been immediate had it then sued to contest the pre-deprivation procedures while the temporary suspension was in effect. But the temporary suspension was terminated, and the time for a hearing has now passed."). The Eighth Circuit affirmed, holding that there was no "actual controversy" within the meaning of the Declaratory Judgment Act "because Regional has closed, the suspension has been lifted, and Regional did not appeal the overpayment determination. Regional's relationship with the defendants has effectively ended." *Reg'l Home*

*Health Care, Inc. v. Becerra*, 19 F.4th 1043, 1044–45 (8th Cir. 2021). Here, the suspension remains ongoing, proving that there is an "actual controversy" under the Declaratory Judgment Act and that the Court may therefore "declare the rights" of the parties. § 2201(a).

**III.    APS Is Entitled to a Preliminary and a Permanent Injunction.**

The Court considers four factors in deciding whether to issue a preliminary injunction: "(1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that [the] movant will succeed on the merits; and (4) the public interest." *Sleep No. Corp. v. Young*, 33 F.4th 1012, 1016 (8th Cir. 2022) (quoting *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981) (en banc)). The balance-of-the-equities and public-interest factors "merge" when the "federal government is the party opposing the injunction." *Missouri v. Trump*, 128 F.4th 979, 996–97 (8th Cir. 2025). Although no factor is dispositive, "the third factor—probability of success—is the most significant." *Sleep No. Corp.*, 33 F.4th at 1016.

The Eighth Circuit has "two standards a district court may apply when assessing a movant's probability of success on the merits." *D.M. ex rel. Bao Xiong v. Minn. State High Sch. League*, 917 F.3d 994, 999–1000 (8th Cir. 2019). The first standard, "which applies in most instances," asks "whether the party requesting a preliminary injunction has a 'fair chance of prevailing.'" *Id.* (quoting *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 732 (8th Cir. 2008) (en banc)). The second standard is "more rigorous" and asks "whether the movant is 'likely to prevail' on his or her claims." *Id.* (quoting *Rounds*, 530 F.3d at 733). The higher standard applies when a movant seeks to enjoin a statute and "reflects the idea that governmental policies implemented through legislation . . . [and] developed through presumptively reasoned democratic processes are entitled to a higher degree of deference." *Rodgers v. Bryant*, 942 F.3d 451, 455–56 (8th Cir. 2019) (quoting *Rounds*, 530 F.3d at 732).

APS is not seeking to enjoin a statute or regulation, so the usual "fair chance of prevailing" standard applies. APS is simply seeking to enjoin an unlawful suspension that *violates* governing regulations, which require "all suspensions of payment . . . [to] be temporary." 42 C.F.R. § 405.372(d)(3)(ii). The government half-heartedly argues that the more rigorous "likely to prevail" standard applies because "APS seeks an injunction against the enforcement of Medicare regulations that authorize CMS to temporarily suspend payments." Gov't Br. 25. That is not true, and the government fails to cite any authority that applies the more rigorous "likely to prevail" standard instead of the usual "fair chance of prevailing" standard to analogous facts.

"To show a fair chance of prevailing, a party must show that its claims provide fair ground for litigation, but it need not show that it has a greater than fifty percent likelihood of success." *Sleep No. Corp.*, 33 F.4th at 1016–17 (cleaned up). Where the "movant has raised a substantial question and the equities are otherwise strongly in his favor, the showing of success on the merits can be less. *Missouri v. Biden*, 112 F.4th 531, 536 (8th Cir. 2024) (quoting *Nebraska v. Biden*, 52 F.4th 1044, 1046 (8th Cir. 2022)); *see also id.* ("If the balance tips decidedly towards the plaintiffs and the plaintiffs have raised questions serious enough to require litigation, ordinarily the injunction should issue." (quoting *Fennell v. Butler*, 570 F.2d 263, 264 (8th Cir. 1978))).

### A.    APS Easily Shows a Fair Chance of Prevailing.

The government's response as to this factor is "all hat and no cattle": It spans only a page, merely cross-references its Rule 12(b)(1) and Rule 12(b)(6) arguments, and belittles APS for "dislik[ing] that CMS has discretionary authority to impose a payment suspension" and that the investigation "is taking longer than APS would prefer." Gov't Br. 25–26. For the reasons above and in APS's Brief, the Court has subject-matter jurisdiction, APS has plausibly alleged each of its claims, and APS easily meets any standard for success on the merits, including "fair chance," "likelihood of success," and "actual success." *See supra* Section I–II; APS Br. 13–24, 25 n.2.

Rather than help its case, the government's factual assertions actually bolster APS's probability of success on its due process claim. Again, the key issue here is whether APS's funds are being "*temporarily* withheld during an active fraud investigation," *Clarinda*, 100 F.3d at 53, or whether the year-long suspension with no agency investigation whatsoever and no end in sight means that the government has crossed the line between a temporary withholding and an indefinite withholding, *Alexandre*, 2021 WL 4206792, at \*7–\*8; *Maynard*, 2003 U.S. Dist. LEXIS 16201, at \*57–\*60; *Krebsbach*, 617 F. Supp. at 551. The government's failure to provide the Court with any factual basis to support a finding that (1) CMS is conducting a Medicare fraud investigation or (2) that any investigation will be temporary as opposed to indefinite should be the end of the matter. But even if it were not, further distinguishing the government action in this case is the total absence of any CMS investigation or enforcement action of any kind.

While the government claims in wholly conclusory fashion that the investigation remains ongoing, there is simply no evidence that CMS is actually investigating. CMS is authorized to conduct agency investigations, either directly or through its UPIC. These agency investigations can include requests for medical records and documentation. *See* 42 C.F.R. § 2.53(a). They often include interviews with providers, beneficiaries, or other interested parties. *See Unified Program Integrity Contractor (UPIC)*, NORIDIAN HEALTHCARE SOLUTIONS, available at https://med.noridianmedicare.com/web/jddme/cert-reviews/upic. CMS also has the authority to conduct site visits, conduct medical reviews, and perform audits. *Id.*; *see also* Medicare Program Integrity Manual, Ch. 8, Rev. 13110 (Apr. 11, 2025), available at https://www.cms.gov/regulations-and-guidance/guidance/manuals/downloads/pim83c08.pdf.

The government has done none of that here. APS has not received any investigatory request from CMS, and the government has refused to provide evidence that the agency is doing anything

at all. To the extent any investigation is being conducted, it is only pursuant to Civil Investigative

Demands ███████████████████████████████. The only investigatory tool the

government has used is a Civil Investigative Demand pursuant to 31 U.S.C. § 3733. Section 3733

specifically applies to False Claims Act investigations. *Id.* (authorizing issuance of a demand to

obtain "information relevant to a *false claims law investigation*" (emphasis added)). It does not

apply to agency or administrative investigations. *Id.*

The False Claims Act "is unusual in authorizing private parties—known as relators—to

sue on the Government's behalf. When a relator files a complaint, the Government gets an initial

opportunity to intervene in the case. If the Government does so, it takes the lead role. If not, that

responsibility falls to the relator, the only person then pressing the suit." *United States ex rel.

Polansky v. Exec. Health Res., Inc.*, 599 U.S. 419, 423 (2023). Even though the relator sues in the

government's name and asserts an injury "exclusive[] to the Government," the relator pockets "up

to 30% of the total" recovery." *Id.* at 425.

Here, the government has conceded that it issued Civil Investigative Demands to APS

███████████████████████████. Gov't Br. 7. ████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████

The result is that APS is left in limbo—with no civil claims to defend, no criminal charges

to fight, and no agency action to challenge—███████████████████████████

████████████████████████████████████████████████████████████. Against

this factual backdrop, a nearly year-long suspension with no end in sight and no legitimate

investigatory efforts by CMS is plainly indefinite and triggers due process protections. *See*

*Alexandre*, 2021 WL 4206792, at *9. Due process requires an opportunity to be heard at a

meaningful time and in a meaningful manner, which means in these circumstances that APS should

receive a reasoned basis for the suspension and a prompt overpayment determination so that APS

can commence the appeal process. *See, e.g.*, *Barry*, 443 U.S. at 66; *Loudermill*, 470 U.S. at 542.

Neither has been provided thus far.

**B.     APS Will Be Irreparably Harmed Without an Injunction.**

Without an injunction, APS will suffer three separate and independent irreparable harms:

(1) deprivation of its constitutional rights; (2) extinction; and (3) the loss of services to Medicare

beneficiaries, particularly in rural areas.

"Irreparable harm occurs when a party has no adequate remedy at law, typically because

its injuries cannot be fully compensated through an award of damages." *Gen. Motors Corp. v.*

*Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009). APS "is not required to prove with

certainty the threat of irreparable harm." *Sleep No. Corp.*, 33 F.4th at 1018. Instead, it need only

"prove that irreparable injury is *likely* in the absence of an injunction." *Id.* (emphasis added)

(quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)).

To start, the "denial of a constitutional right" is an "irreparable harm." *Ng v. Bd. of Regents*,

64 F.4th 992, 998 (8th Cir. 2023) (citation omitted); *see also Book People, Inc. v. Wong*, 91 F.4th

318, 340–41 (5th Cir. 2024) ("When an alleged deprivation of a constitutional right is involved,

most courts hold that no further showing of irreparable injury is necessary." (citation omitted));

*Elrod v. Burns*, 427 U.S. 347, 373–74 (1976) ("The loss of First Amendment freedoms, for even

36

minimal periods of time, unquestionably constitutes irreparable injury."). Because the government has deprived APS of its property without due process of law, APS has suffered, and continues to suffer, irreparable harm.

There is more. "The financial impact on APS caused by its suspension from receiving CMS payments has been extraordinary and likely irreversible." Ex. 1 ¶ 9 (Hannah Suppl. Decl.). APS explained in detail the drastic measures it has taken to stay afloat, including liquidating lines of business, abandoning strategic growth plans, leaving positions unfilled, and incurring the costs (without compensation) of performing services for Medicare beneficiaries to keep its relationships with its customers. APS Br. 7–9. "APS will soon be unable to fully pay its vendors and is at risk of losing services due to nonpayment. If APS's vendors terminate the services they are providing, APS will no longer be able to operate." Ex. 1 ¶ 22 (Hannah Suppl. Decl.). The threatened extinction of a business is textbook irreparable harm because "[w]hat [APS] stands to lose"—"an ongoing business representing many years of effort and the livelihood of its . . . owners"—"cannot be fully compensated by subsequent monetary damages." *Roso Lino Beverage Distribs., Inc. v. Coca Cola Bottling Co. of N.Y., Inc*., 749 F.2d 124, 125–26 (2d Cir. 1984) (per curiam); *see also* APS Br. at 12–13 (collecting cases).

The government claims that the declarations APS attached to its motion are an insufficient evidentiary basis to support a finding of irreparable harm. Gov't Br. at 27–28. But the level of detail they contain render them far removed from the "vague and speculative" statements that fell short in *Padda*. 37 F.4th at 1384. APS's three declarations (two attached to its motion and one attached to this filing) provide more than sufficient factual detail to support a finding that irreparable injury is likely absent an injunction:

- "Payment for services rendered to Medicare beneficiaries amount to approximately $1.3 million per month, which was 30-40% of APS's revenue at the time of the suspension."

- "Because the percentage of APS revenue attributable to CMS is greater than APS's profit margin on any services, APS is operating at a substantial loss that is compounding each month."

- "APS has operated at a loss in all months since the suspension was imposed, with only one exception."

- "In May 2025, APS lost approximately $600,000, due to CMS's suspension of payments to APS."

- "APS has lost more than 30 employees since the suspension was imposed[.]"

- "Prior to the suspension, APS had plans to expand. It had added an average of two pathologists (and associated support staff) each year, as well as 1-2 referral partners. APS had specific plans to grow expansion in early 2025. APS was forced to abandon those plans under the suspension, as efficiency and survival became the priority."

- "APS sold its Podiatry division in 2024 because it was critically reliant upon CMS payments to be profitable. APS has been unable to service its prior Podiatry clients as a result, and those clients are unlikely to ever return to APS."

- "In selling its Podiatry division, APS lost more than 50% of its overall revenue."

- "APS is currently winding down its Stool Division because it also heavily relies upon CMS payments to be profitable, and APS cannot continue to operate at a net loss."

- "Unless the suspension is lifted and APS's Medicare payments are released, APS will be forced to shut down. Absent additional credit or liquidation, APS will have insufficient funds to continue operations in 2-3 months."[9]

The government's next line of attack is to fault APS's Chief Executive Officer for "fail[ing] to mention that the proceeds of the podiatry practice sale were not used to fund APS operations. Rather, APS made multiple multi-million-dollar distributions directly to APS's individual owners." Gov't Br. at 28. APS can hardly be blamed for amputating (and liquidating) the limbs of

---

[9] APS will present further evidence of the suspension's financial impact at a hearing if that would aid the Court in its decision. *See supra* note 4.

the business that are bleeding it dry because the government refuses to pay for the Medicare services it provides. What does the government expect to happen when it withholds a substantial portion of business's revenue for nearly a year? Nor is there anything unusual about a business distributing liquidation proceeds to its owners instead of reinvesting, particularly when the government has all but forced the business into a death spiral.

The end of APS will also bring the end of many Medicare beneficiaries' access to the specialized services it provides. This, too, is "sufficient for irreparable injury." *See Family Rehab., Inc.*, 886 F.3d at 504 ("The combined threats of going out of business and disruption to Medicare patients are sufficient for irreparable injury."). "APS's pathologists are fellowship-trained and highly experienced, and their skillset does not exist in many local markets." ECF No. 9-1 ¶ 27. "If APS is forced to shut down, many Medicare beneficiaries—particularly those in rural areas that we serve—will not have access to the specialized services APS provides." *Id.* The government disparages APS's declarations on this point because CMS "determined" (it is unclear *how*) that there were sufficient providers to serve the Medicare beneficiaries in APS's area. Gov't Br. 29. But the government is not the arbiter of factual disputes—the Court is. The Court may choose to credit a business owner's knowledge of the local market he serves over the government's conclusory and unsupported representations to the contrary.

## C.    The Equities and Public Interest Weigh Heavily in Favor of an Injunction.

When the federal government is the party opposing the injunction, the balance-of-the-equities and public-interest factors "merge." *Trump*, 128 F.4th at 996–97. As an initial matter, the "federal officials' interest" in holding onto APS's Medicare funds "is minimal given [APS's] strong likelihood of success in showing" that they have unlawfully withheld those funds. *See id.*; *see also League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) ("[A] high likelihood

of success on the merits is a strong indicator that a preliminary injunction would serve the public interest. There is generally no public interest in the perpetuation of unlawful agency action. To the contrary, there is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence.'" (citation omitted)). And whatever interest the government may have in combatting Medicare fraud, it has no interest in doing so by unlawfully suspending APS's Medicare payments without due process and in violation of binding federal regulations. *See Kentucky v. Biden*, 23 F.4th 585, 598 (6th Cir. 2022) ("[T]he public's true interest lies in the correct application of the law.").

Nor will the federal government be harmed by releasing APS's property. At the end of the day, the "government gets its due sooner or later (with interest)" because APS will have to pay back any funds that it obtained by fraud. *See Sahara Health Care, Inc.*, 975 F.3d at 530. The government nonetheless contends that "there is a significant risk that those funds would not be available for future collection should the United States ultimately determine APS engaged in fraud. In particular, there are real concerns that APS might dissipate those funds to its owners." Gov't Br. 30. This so-called "risk" is absurd and factually baseless. The only way that funds would not be available for future collection is if APS somehow had insufficient assets to return any funds obtained by fraud. There is not a shred of evidence supporting the idea that APS's owners would sell off the farm, distribute the proceeds, and pocket the released funds, leaving nothing left for the government. As explained, it was the government that put APS in a position where it was forced to liquidate a line of business that was bleeding money because it was heavily dependent on Medicare payments that were not being received. When a business receives money, it necessarily uses it to pay bills, reinvest in the business, or make a distribution to its owners—there is nothing strange or nefarious about APS distributing money that it received through a liquidation.

The federal officials' interests here are especially minimal when measured against the grave harm APS will suffer without an injunction. *See Dataphase Sys.*, 640 F.2d at 113 (stating that, in balancing the equities, courts weigh the "threat of irreparable harm to the movant" against "the injury that granting the injunction will inflict on other parties litigant"). APS will soon cease to exist because the government has unlawfully withheld millions of dollars without a meaningful opportunity to challenge the deprivation. Releasing the funds will both allow APS to stay in business and rectify the unconstitutional deprivation of those funds. "Surely, upholding constitutional rights serves the public interest." *Newsom v. Albemarle County Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003).

## IV.    The Court Should Decline to Require APS to Post a Bond.

Under Federal Rule of Civil Procedure 65(c), "the court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Although this rule is couched in mandatory terms, Eighth Circuit caselaw is clear that a court may decide that the "proper" amount of the bond is $0 "based on its evaluation of public interest in th[e] specific case." *Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs*, 826 F.3d 1030, 1043 (8th Cir. 2016) ("[I]t was permissible for the district court to waive the bond requirement based on its evaluation of public interest in this specific case."); *accord BankDirect Capital Fin., LLC v. Capital Premium Fin., Inc.*, 912 F.3d 1054, 1058 (7th Cir. 2019) ("A judge might consider an indemnity of $0 (that is, no bond) 'proper' when the suit is about constitutional principles rather than commercial transactions[.]"). The Eighth Circuit has also noted that district courts within the Circuit have not required a bond "where the damages resulting from a wrongful issuance of an injunction have not been shown."

*Richland/Wilkin Joint Powers Auth.*, 826 F.3d at 1043. Ultimately, so long as the Court "make[s]

the necessary findings in support of its determination," the "amount of the bond rests within [the

Court's] sound discretion." *Id.* at 1042 (first quoting *Hill v. Xyquad, Inc*., 939 F.2d 627, 632 (8th

Cir. 1991); and then quoting *Stockslager v. Carroll Elec. Coop. Corp*., 528 F.2d 949, 951 (8th Cir.

1976)).

The Court should not require APS to post a bond for the public interest reasons set forth in

Section III.C. Nor should the Court credit the government's bald assertion that it "would have no

ability to recover those funds" should the injunction turn out to be improper. Gov't Br. 31. APS is

obligated to pay back any funds that it obtained by fraud. In the end, the "government [will] get[]

its due sooner or later (with interest)." *Sahara Health Care, Inc.*, 975 F.3d at 530.

**V.    The Court Should Consolidate the Preliminary Injunction Hearing with the Trial on the Merits.**

Advancing the trial on the merits and consolidating it with the preliminary injunction

hearing "saves time and conserves judicial resources." *Campaign for Family Farms v. Glickman*,

200 F.3d 1180, 1185 (8th Cir. 2000). Given that the evidence at the preliminary injunction hearing

and the trial on the merits would be largely the same, consolidation is particularly appropriate here.

*See* Fed. R. Civ. P. 65 advisory committee notes to 1966 amendments ("The authority [to

consolidate] can be exercised with particular profit when it appears that a substantial part of

evidence offered on the application will be relevant to the merits and will be presented in such

form as to qualify for admission [at] trial.").

The government's only objection to APS's request for consolidation is that "the Court lacks

subject matter jurisdiction over APS's claims, [so] the Court should not conduct a trial on the

merits." Gov't Br. at 32. But because the government has raised a factual challenge to subject-

matter jurisdiction, the Court should wait to rule until it has a complete evidentiary record on which

to make its jurisdictional findings. That will not occur until the hearing. And because the evidence at the hearing and the trial would be largely the same, the Court should consolidate and address the jurisdictional and merits issues at the same time.

If the Court decides to consolidate the preliminary injunction hearing with the trial on the merits, APS requests that the Court provide (1) appropriate notice so that the parties can prepare to present their full case, *see Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981), and (2) a short window for expedited discovery.

## **CONCLUSION**[10]

For the reasons above, APS respectfully requests that this Court deny the government's motion to dismiss and issue an injunction ordering the government to release APS's property immediately and to issue an overpayment determination so that, if necessary, APS can commence the administrative review process.

COZEN O'CONNOR

Dated: June 25, 2025

By: */s/ Dustin McDaniel*
Dustin McDaniel
Bar No. 99011
*Attorney for Plaintiff,*
*Advanced Pathology Solutions, PLLC*
Cozen O'Connor
1307 W. 4th Street

---

[10] Throughout this response, APS repeatedly points out the government's failure to address its arguments and key components of governing tests. The government should not be permitted to cure these failures in its reply. Allowing the government to do so would both sandbag APS and unnecessarily delay these proceedings even further. APS reserves its right to move to strike any responses or arguments in the government's reply that it could have and should have raised earlier as waived and/or untimely.

Nor should the Court paper over the government's briefing infirmities: A "litigant may not advert perfunctorily to an argument, hoping that [the court] will do its work for it by developing the argument and putting flesh on its bones." *Sturgis Motorcycle Rally, Inc. v. Rushmore Photo & Gifts, Inc*., 908 F.3d 313, 324 (8th Cir. 2018). This is especially true when the litigant is the federal government—it is hard to fathom a more sophisticated party with greater resources.

Little Rock, Arkansas 72201
Tel: (501) 404-4010
E-mail: dmcdaniel@cozen.com

Arthur P. Fritzinger
Penn. Bar No. 309533
*Admitted pro hac vice*
*Attorney for Plaintiff,*
*Advanced Pathology Solutions, PLLC*
Cozen O'Connor
1650 Market Street, Suite 2800
Philadelphia, Pennsylvania 19103
Tel: (215) 665-7264
E-mail: afritzinger@cozen.com